CULPEPPER, Judge.
This is a wrongful death action by the widow and children of Jesse C. Canter, Jr., who was killed in an industrial accident. At the time of his death, Canter was employed by Industrial Construction Company as foreman of a crew which rigged and operated cranes. They were engaged in the performance of a contract with Pittsburg Plate Glass Company to construct a chemical plant in Lake Charles. Two large cranes were being used to lift a heavy steel vessel, designed for use as a chemical still. One of the cranes collapsed, and the boom fell on Mr. Canter, killing him almost instantly.
In their original and supplemental petitions, the plaintiffs named as defendants the following and their insurers: Koehring Company, manufacturer of the crane; Fur-low-Laughlin, lessor of the crane; Pitts-burg Plate Glass Company, owner of the vessel; five individual members of the engineering department of Pittsburg; the president and vice president of Industrial Construction Company; Fritz W. Glitch & Sons, Inc., manufacturer of the vessel; and Bituminous Casualty Corporation, the alleged liability insurer of the executive officers of Industrial.
Plaintiffs’ demands against several of these defendants were dismissed on motions for summary judgment. A compromise settlement was made by plaintiffs with other defendants, who were also dismissed. The remaining defendants, as to whom the case was tried on the merits, are the following engineers of Pittsburg Plate Glass Company: Robert E. Baker, superintendent of engineering; Ben F. Spaulding, plant construction engineer; William L. Smith, Jr., construction area engineer; Theodore C. Sachs, project engineer; and Clifford Stacy, field engineer. Also at issue in the trial was the negligence of the following with whom plaintiffs compromised. Guy Sockrider, president of the Industrial Company; John McGraw, vice president of Industrial; George Frenzel, job superintendent for Industrial; and Koehring, manufacturer of the crane.
The jury decided that all of the Pitts-burg engineers, except Ben F. Spaulding, were negligent and awarded judgments against them and their insurers. The trial judge decided that George Frenzel, Industrial’s job superintendent, was also negligent and reduced the award by one-fifth, since he was found to be a joint tort feasor with whom plaintiffs had previously settled. The defendants who were cast, appealed. Plaintiffs appealed the judgment insofar as it held George Frenzel negligent and reduced the award by one-fifth.
Both legal and factual issues are presented. The essential legal issue is the extent of the duty of an agent to a third person for failure to perform a duty owed by the agent to his principal. In Spillers v. Northern Assurance Company of America, 254 So.2d 125 (3d Cir. 1971) a majority of the panel in the present case stated the law as follows:
“In the recent case of Mertice Maxey v. Aetna Casualty & Surety Company, et al., 225 [255] So.2d 120 (La.App. 3rd Cir. 1971) a different panel of this court (Judges Savoy, Hood and Culpepper) considered a similar action by an employee against the executive officers of the corporate employer. The majority decision in that case can be summarized as follows: (1) The holding in certain early cases that a corporate officer is liable in tort to third parties only for acts of malfeasance and misfeasance and not acts of nonfeasance, was rejected. (2) Where a corporate officer owes a duty exclusively to the corporation, the breach of such a duty cannot give rise to a cause of action in tort by a third party. (3) The duty which a corporate officer owes to a third person is the same as that owed by any person not to injure another, and it is immaterial whether *272 the breach of such a duty to a third person also constitutes a breach of duty to the corporation.
“The writer of the present opinion concurred with the majority decision in the Maxey case, but differed from the statement of law in certain respects. The writer agreed with the first and second holdings listed above, but could not agree that in every situation it is immaterial whether the agent has breached a duty to his principal. A simple illustration of this is the situation where an agent is in charge of property, with the duty to cause all necessary repairs to be made. In order to find the agent liable for an injury sustained by a third person, due to the agent’s neglect to keep the premises in repair, the agent’s obligation under the agency contract must be proved. Otherwise, the agent would have no duty to the third person. In this situation, the duty of the agent to his principal is relevant to the claim of a third party.
“In the concurring opinion in the Maxey case, the law is correctly stated as follows :
“ ‘Generally, I agree with the law stated in Adams v. Fidelity & Casualty Company of N. Y., 107 So.2d 496 (La.App. 1st Cir. 1958) as commented upon in Malone & Guerry, Studies in Louisiana Torts Law, 523-525. In the Adams case the widow of an employee sued certain co-employees and officers of the corporate employer, seeking damages for the wrongful death of her husband. He was killed when struck by an iron reel, which fell from a stack of steel in the employer’s yard. The court held a cause of action was alleged only as to those corporate officers or employees who had knowledge of the hazard and, by virtue of their positions, had the duty and the authority to remove the hazard. Under this rationale, the court found the president of the corporation, who had no knowledge of the hazard, was not liable simply because of his position. It also held that the driver of the truck which hauled the iron reel in question was not liable, since, even though he had knowledge of the hazard, he had no duty or authority to correct the dangerous condition. However, the court found a cause of action was stated against the safety director, the warehouse superintendent and the vice-president in charge of these particular operations, since they knew about this dangerous condition, had the duty and authority to correct it and failed to do so.
“ ‘Malone & Guerry, Studies in Louisiana Torts Law, at page 524, comments on the Adams case as follows:
“ ‘ “In considering the Adams decision it should be borne in mind that the agent should not be held responsible to a third person for his mere failure to perform an affirmative duty toward his principal unless (a) the principal owed a duty of care toward the third person, and (b) this same duty was delegated to the agent, who undertook its performance. When both these conditions have been met it will be found that the agent, by failing to perform his duty, has deprived the third person of the protection to which the latter was entitled and which, presumably, he would have received from the principal if the agent had not undertaken its performance. Under these circumstances the failure of the agent serves as a positive interference with the third person’s right to reasonable protection by the principal, and his negligence becomes something more than nonfeasance.
“ ‘ “But the converse is also true. When the principal is not encumbered with any duty toward the third person or, even if he is so encumbered, he has not delegated its performance to the agent, there is no reason why mere nonfeasance by the agent should result in his liability.”
“ ‘Malone points out that the Restatement, Agency, § 354 (2d Ed. 1958) has adopted a similar rule imposing “on the agent a duty of care toward third per *273 sons whenever his failure to act without negligence would serve to deprive the third person of some protection owed the latter by the principal.” ' ”
The substantial factual issue is whether the defendant-engineers of Pittsburg had the duty, under the terms of the contract between Pittsburg and Industrial and the circumstances prevailing, to calculate the weight of certain appurtenances added at the jobsite by Industrial to the vessel (whose shipping weight was 92,487 pounds) and to communicate such added weight to Industrial for use in choosing and rigging the cranes, without any request being made by Industrial or its personnel for such added weight. Plaintiffs contend Pittsburg had this duty and delegated it to its engineers, and that the failure of the engineers to perform this duty caused the decedent to rig the cranes in such a manner that they could not lift the total load of about 106,000 pounds.
Plaintiffs also contend defendants were negligent: “In failing to properly supervise the work being performed.”
The facts show that on June 1, 1966 Pitts-burg Plate Glass Company entered into a contract with Industrial Construction Company, a local contractor in Lake Charles, for the construction of a vinyl chloride plant on Pittsburg’s property at Lake Charles. Industrial had previously performed several similar contracts for Pitts-burg. When completed, the plant would consist of about four large vessels, technically termed “products stills.” Generally, the contractor was to provide all labor and equipment necessary to construct the concrete foundations, move the vessels from railroad sidings to the foundation sites, weld or otherwise attach to these vessels certain ladders, piping, platforms, valves, etc., and then lift the vessels into place and complete the installations. Pittsburg agreed to furnish the vessels and all appurtenances to be added and to provide any additional drawings or instructions necessary to execute the work. Of particular relevance to this litigation is the following paragraph, a blowup of which was exhibited by plaintiff’s counsel to the jury:
“II. Detailed Drawings and Instructions :
Owner shall furnish to contractor, as promptly as is reasonably possible, additional instructions, by means of drawings or otherwise, consistent with the contract documents, as may be necessary for the proper execution of the work. Contractor shall execute the work in conformity therewith and shall do no work without proper drawings and instructions from the Owner.”
Additionally, the contract provided:
“V. ENGINEERING
A. General
The Owner’s Engineering Department will furnish all Drawings, Bills of Material, and Specifications. This information is distributed by the Construction Engineer. Requests for additional information or clarification of existing information will be directed to the Construction Engineer.”
The vessels were manufactured by Fritz W. Glitch & Sons, Inc. of Dallas, Texas, and shipped to Lake Charles by rail. Prior to the arrival of the vessels in Lake Charles, a pre-job conference was attended by representatives of Pittsburg and of Industrial for the general purpose of understanding the contract, plans, specifications, etc. At this conference, Pittsburg furnished to Industrial an “Equipment List— Tanks and Vessels” (P-6), listing the different vessels and other pieces of equipment to be installed. One column on this document shows “Weight Empty” of each vessel. Written in pencil for vessel #C-205, the one with which we are concerned, was the figure “92,500” pounds.
At this pre-job conference Pittsburg also delivered to Industrial a copy of the manufacturer’s plans and specifications of this particular vessel (P-3). This docu *274 ment shows: “Estimated vessel weight 70,277, estimated tray weight 22,260, total estimated shipping weight 92,457.” When the vessel in question arrived by rail from Dallas, this weight was stamped on its side.
Also delivered by Pittsburg to Industrial were plans and specifications (P-8) of the ladders, piping, handrails, instruments, etc., which were to be welded or otherwise attached to this particular vessel by Industrial after it arrived in Lake Charles. The weights of these appurtenances were not given in this or any other document.
There is no express contractual requirement that Pittsburg or its engineers furnish the weights of the appurtenances to Industrial. Nor is there any evidence that there was a previous practice or verbal understanding that Pittsburg’s engineers furnish the weights to be lifted. Mr. John McGraw, vice president of Industrial, and the one who chose the two cranes for this job, testified:
“Q. So Industrial Construction Company had the responsibility of doing all field work in erecting this vinyl chloride unit, is that not a fact?
A. Well, yes, sir.
Q. In the past have you ever had PPG engineers calculate the weight of the dressing, these extra appurtenances, such as ladders, catwalks, gratings, and things of that nature, and give them to you prior to making a lift?
A. To my knowledge, no. As I say, I may not be the man in our organization that would receive this.
Q. To your knowledge has that ever . been requested by anyone in your organization in the past?
A. I did not have knowledge of it, no, sir.”
Mr. Theodore Sachs, the project engineer for Pittsburg and one of the defendants, testified:
“Q. From the time of your first general prejob conference with the contractor, and throughout the subsequent meetings that you referred to, was any request ever made of you to furnish weights of these ladders and platforms, and et cetera?
A. We were never requested to furnish any weights, to my knowledge, other than major equipment weights.
Q. Were you ever requested to make any gravity center studies, or anything like that ?
A. No.
Q. Do you normally do that, Mr. Sachs ?
A. No.
Q. Does the contractor normally ask for it?
A. I have never had it asked of me.”
Of course, if Industrial or its personnel had requested additional information as to weights, this information would have been furnished, in compliance with the above quoted provision of the contract that Pitts-burg would furnish engineering services. But no such request was ever made.
Mr. George Frenzel, Industrial’s job superintendent, who actually supervised on the job the execution of Industrial’s contractual obligations, including the lift in question here, testified he was present at the pre-job conference and received a copy of the documents showing the weight of the vessel to be 92,500 pounds, or approximately 46 tons. He knew that the weights of the ladders, piping and other appurtenances had to be added. But on previous lifts of other vessels he had not found it necessary to secure the weights of the appurtenances, and he did not do so here. He testified as follows:
“Q. I said, during that time was there ever any discussion between you *275 and any of the PPG personnel as to the extra weight that was being added to this 92,487 pounds?
A. No.
Q Sir?
A No.
Q Why was that?
A I don’t know.
Q You knew it was going to add some weight, didn’t you ?
A I knew we had to add these platforms and these ladders.
Q They are made out of steel, are they ?
A Steel.
Q Do you normally — where you are doing something like this, do' you normally get the weight of the ladders and platforms?
A No. I never did see the weight for the ladders.
Q Did you figure you had enough capacity there to handle that?
A Right.
Q Even with the 92,000, and whatever was added on it you figured you had the capacity?
A Right.”
Frenzel testified further that he showed a copy of the plans, giving the weight as approximately 46 tons, to the rigger foreman, Mr. Canter. According to Frenzel, it was the duty of the rigger foreman to get the weight to be lifted and then position the cranes and rig them with the proper boom length, radius, etc. Frenzel said: “I can’t tell these people how to do it.”
The trial judge was clearly correct in finding Frenzel negligent. He knew the shipping weight of the vessel, had supervised the addition thereto of the appurtenances and knew that this was added weight. Frenzel had supervisory control and had the duty to advise the rigger of the weight to be lifted. If he did not know the weight, he should have requested this information from Pittsburg’s engineers or some other reliable source. Why didn’t he do this? Maybe it was because he had never done so before. Or perhaps he relied on the fact that these same two cranes had been used, but with different rigging, when the vessel was lifted from the railroad car. Or maybe he relied on the rigger making the customary field test, i. e., first lifting the load a few inches and holding there for a few minutes before raising. Such a field test was made in the present case, and the crane held for a few minutes, but then collapsed when the load was lifted on up. In any event, Frenzel failed in his duties.
• The evidence preponderates that the cause of the accident was that one of the two cranes, a Koehring with a rated capacity of 50 tons, was rigged in such a manner that it was overloaded. The expert testimony is in conflict as to whether, with the radius and boom length being used, this crane’s lifting capacity was even sufficient for one-half of the 92,500 pounds. It was clearly not sufficient for the actual load of approximately 106,000 pounds.
We conclude that neither under the contract nor previous custom nor any verbal or other understanding did Pittsburg or its engineer have the duty to calculate the weight of these added appurtenances and advise Industrial or its personnel of the total weight to be lifted, without any request being made for this information.
Furthermore, the evidence shows that Pittsburg’s engineers had no supervisory control over this lifting operation. Generally, the contract provided that Pitts-burg’s engineers would inspect the work to see that Industrial performed its contractual obligations in a good and workmanlike manner. But these engineers did not have the authority to tell Industrial how to do the work required by the contract.
*276 In this connection, Mr. McGraw, vice president of Industrial testified:
“Q Under whose direction and control was this lift being made at the time of the accident? On September 13, 1966.
A It was under the direction of Industrial Constructions Company’s forces.
Q It was not to your knowledge being directed by PPG personnel?
A No, sir.”
This was also Mr. Frenzel’s understanding of the contract. He testified as follows with regard to the engineers’ duty and authority :
“Q You say they would see that it was done in a workmanlike manner, you mean, they would kind of check you after you had done the work?
A Checking the jobs.
Q They didn’t show you how to do it, did they?
A No.”
* * * * * *
“Q Did you take your orders on something like that from Mr. Stacy?
A On which kind of orders?
Q On what kind of cranes to use, and how to rig them up ?
A No.”
Of course, the engineers themselves also testified they had no duty or authority to tell Industrial how to perform its contractual obligations. They had only the right to inspect and determine whether these obligations had been fulfilled. It is clear that the engineers had no duty or authority to tell Industrial what cranes to use, how to read the rigging charts, or how to rig the cranes. The lifting operation was under the sole control of Industrial.
We conclude that Pittsburg did not have the duty to advise Industrial or its personnel of the total weight to be lifted, without being asked for this engineering information. Since Pittsburg, the principal, did not have this duty, it could not and did not delegate it to its engineers. Furthermore, neither Pittsburg nor its engineers had any supervisory control over the methods used by Industrial in this lifting operation. We find no fault on the part of defendants.
For the reasons assigned, the judgment appealed is reversed and set aside. It is now ordered, adjudged and decreed that there be judgment herein in favor of the defendants, dismissing plaintiffs’ suit at their cost. All costs of this appeal are assessed against the plaintiffs.
Reversed and rendered.
DOMENGEAUX, J., dissents and assigns written reasons.