279 So.2d 242 (1973)
Chester L. COOKSEY, Plaintiff-Appellee,
v.
CENTRAL LOUISIANA ELECTRIC COMPANY, INC., Defendants-Appellants.
No. 4204.
Court of Appeal of Louisiana, Third Circuit.
June 12, 1973.
*244 Stafford, Pitts & Stafford, by John L. Pitts, Alexandria, for defendants-appellant.
Gravel, Roy & Burnes, by Chris J. Roy, Alexandria, for plaintiff-appellee.
*245 Before FRUGEé, SAVOY, and MILLER, JJ.
SAVOY, Judge.
This is a personal injury suit filed by plaintiff against Central Louisiana Electric Company, Inc. (Cleco); three of its stockholder employees, Carroll Fusilier, Martin Thiels, and Johnny Clarius; and their insurer, Continental Casualty Company. An exception of no cause of action filed by Cleco was sustained by the trial court. After a trial on the merits, the jury granted plaintiff judgment in the sum of $650,000.00 against the three individual defendants and Continental (by whom coverage was stipulated during the trial). All defendants appealed. In this court they contend that the jury erred in four particulars: (1) in finding that the three defendants owed a duty to the plaintiff independent of their duty to Cleco to provide safe working conditions for employees and to exercise reasonable care in protecting the corporation from legal liability; (2) in finding that the three individual defendants were in any way negligent; (3) in failing to find that the plaintiff was contributorily negligent; and (4) in awarding a grossly excessive judgment of $650,000.00.
The record reveals that plaintiff-appellee Cooksey was employed by Hayes Construction Company which did subcontracting work for Cleco. The crew of which Cooksey was foreman worked exclusively for Cleco under the supervision of John Clarius. Their employment was strictly limited to cold work, i. e. to construction of substations or additions to substations which were not energized. They were not allowed to work on energized wiring.
Cleco had hired the crew to make an addition to the already activated Buhlow substation in Alexandria, Louisiana. This new portion of the substation was to provide additional electricity along Cleco's lines in the area. The purpose of a substation is to reduce high voltage brought into the station by transmission lines to lower voltages which may be distributed along the company's distribution lines to consumers. Cleco had determined the necessity of adding an additional circuit to the substation.
This required not only an addition to the substation itself, but new lines leading from the substation. The cold work performed by Cooksey's crew consisted of the construction of steel girders, buss work, concrete slabs, stands, insulated bells, and fabricated steel to be erected in the Buhlow substation next to the already functioning portion of the substation. At the same time D & E Construction Company was adding another cross-arm on the poles along the highway north of the station to accommodate the three additional circuits which would emanate from the substation. Two poles were erected between the rear of the substation and the already existing transmission line in order to connect the new circuit to the enlarged substation. The substation's facilities erected by Cooksey's crew were to be connected to the substation by a Cleco crew after all other work had been completed. Unknown to Cooksey, on December 11, 1969, while he and his crew were performing work for Cleco on another substation, D & E Construction had, with the knowledge and approval of Cleco, joined the new circuit to active transmission lines. This caused 7,600 volts of electricity to feed back into the uncompleted addition to the substation.
On December 12, 1969, Mr. Clarius ordered Cooksey and his crew to proceed to the substation with a gin-pole truck and install a reclosure switch (a type of overload oil switch the purpose of which is to cut off the current in the event of a short or fault occurring on the line). Once at the substation they had to lift the 300 pound reclosure switch over an eight foot hurricane fence with the gin-pole truck and position it over a metal stand. At this point Cooksey stopped the operation in order to check the newly installed lines for static electricity. The record establishes that *246 unenergized lines which run parallel to or between energized lines are sometimes thereby charged with static electricity. He stepped upon a meter box and attempted to touch the line with a wooden carpenter's rule. As he touched the energized line, he received a violent charge of electricity resulting in serious injuries, particularly the loss of his left arm and the loss of muscle tissue in his right leg.
The issues raised by defendants-appellants' first two specifications of error are interrelated and will be discussed together. While the breach of a duty owed exclusively to the corporation, such as the general duty to provide employees with safe working conditions or to protect the corporation from legal liability, may not always subject the corporate agent to delictual liability to an employee or a third party, the corporate agent's negligent failure to fulfill a delegated responsibility to provide employees with certain safe equipment or guard them against certain unsafe working conditions can sometime result in the creation of a delictual obligation toward the employees or third persons. Maxey v. Aetna Casualty & Surety Company, 255 So.2d 120 (La.App. 3rd Cir., 1971); Dulaney v. Frugeé, 257 So.2d 827 (La.App. 3rd Cir., 1972); Canter v. Koehring Company, 267 So.2d 270 (La.App. 3rd Cir., 1972); Dever v. Employers Liability Assurance Corp., Ltd., 266 So.2d 455 (La.App. 4th Cir., 1972). This case, however, involves more than the mere failure to provide safe working conditions. Plaintiff-appellee Cooksey attempted to prove to the jury that his supervisors, knowing that he only worked on unenergized lines, allowed the line to be energized (unknown to him and for no useful purpose), and then ordered him to install the reclosure switch immediately below the energized lines. The validity of the jury's verdict depends upon whether there is sufficient evidence in the record to support a finding that the three defendants owed a duty to Cooksey to protect him from this harm and whether their failure to do so was negligent, for it is axiomatic that the findings of fact of a jury will not be overturned unless those findings are manifestly erroneous.
There is no doubt that Cleco had a duty to warn Cooksey that the line was energized. A utility's duty in this regard has been recently summarized in Nessmith v. Central Louisiana Electric Company, 257 So.2d 744 (La.App. 3rd Cir., 1972), writ refused 261 La. 480, 259 So.2d 921 (1972); and Bordelon v. Continental Casualty Company, 229 So.2d 761 (La.App. 3rd Cir., 1970), writ refused, 255 La. 483, 231 So.2d 396 (1970). In Bordelon we stated:
"The operator of high voltage electric lines is required to use the utmost care to reduce hazards to life as far as practicable, [citations omitted]. In places where it should be reasonably anticipated that person may come in contact with electric lines, the operator is required to insulate them or take other proper precautions. (citations omitted). However, the power company is not required to guard against hazards which cannot be reasonably anticipated. (citations omitted)."
Where electric lines cannot be insulated the utility must give adequate warning of the danger. Nessmith, supra.
The record shows that each of the three defendants had been delegated the duty and authority to protect Cooksey from harm caused by electric shock.
After careful consideration of the record, we conclude that while Clarius' negligence caused Cooksey's injury, both Fusilier and Thiels carried out their duties in such a manner that Cooksey would not have been injured had Clarius fulfilled his assigned duties. Carroll Fusilier, an electrical engineer, was Cleco's division engineer. His general responsibility was to plan load growth and to make adjustments on the system within the budgetary limits of the company. He was in charge of planning for substation and line capacity and in particular had overall supervision of *247 the addition of the new circuit at the Buhlow substation. Martin Thiels was the transmission and distribution superintendent for the Pineville District. He was also in charge of energizing and de-energizing power lines in that area on the day of the accident. However, he was not in charge of substations until after they had been completed. John Clarius was Cleco's substation technician. He was the immediate supervisor of Cooksey's crew. Cleco's safety rules direct that "when working on one section of a substation or compartment adjacent to other sections or compartments where there are energized circuits or apparatus, the section or compartment being worked on shall be conspicuously marked with ropes and/or barriers to designate the working areas." Of particular importance as to Mr. Clarius, the rules also stated that "the foreman will direct the work, issue instructions, and will have full responsibility of the job. If any employee does not cooperate in team work to insure a safe job, he is to be relieved immediately..." Mr. Thiels testified that Cleco required the foreman (Clarius) to be present whenever crews were working in the vicinity of energized facilities.
A corporate agent owes to another employee or a complete stranger the duty to exercise due care not to injure him which any person owes to another. LSA-C.C. Article 2315 et seq., Dever v. Employers Liability Assurance Corp., Ltd., 266 So.2d 455 (La.App. 4th Cir., 1972), writ refused, 263 La. 362, 268 So.2d 256 (1972); Maxey v. Aetna and Casualty Surety Company, 255 So.2d 120 (La.App. 3rd Cir., 1971), writ refused 260 So.2d 123, 255 So. 2d 351 (1971). Negligence is the failure to exercise ordinary or reasonable care which would be exercised by a person of ordinary prudence under all circumstances in view of the probability of danger of injury. Conversely, reasonable or due care is that degree of care which would be exercised by a reasonable prudent person under similar circumstances. Tucker v. Travelers Insurance Company, 160 So.2d 440 (La.App. 2nd Cir., 1964). Stated differently negligence is the creation of an unreasonable risk of harm to others. Helminger v. Cook Paint and Varnish Company, 230 So.2d 623 (La.App. 3rd Cir., 1970); Eubanks v. Gore, 269 So.2d 258 (La.App. 3rd Cir., 1972); Taylor v. National Indemnity Company, 215 So.2d 203 (La.App. 3rd Cir., 1968); and Allien v. Louisiana Power & Light Company, 202 So.2d 704 (La.App. 3rd Cir., 1967), writ refused 251 La. 392, 204 So.2d 574 (1967).
Both Fusilier and Thiels knew that the line had been energized. Although they did not de-energize the line, they did undertake to protect Cooksey from the risk of harm which the energized line presented. Thiels was not in charge of the cold work which Cooksey's crew was hired to perform; he had no connection with Cooksey's crew. Fusilier's authority over Cooksey's crew was through Clarius. Plaintiff-Appellant Cooksey contends that Thiels' permitting the line to be energized was negligent. However, Thiels informed Fusilier that the line was energized. Fusilier testified that both he and Thiels told Clarius that the line was energized. It is important here to note that neither Thiels nor Fusilier had the duty to personally warn Cooksey that the line was energized. Their duty was to inform Clarius that the line was energized. This they did. There is no evidence in the record that they were not justified in relying upon Clarius' performing his assigned duty to protect Cooksey's crew from the energized line. Thus, within the parameters of their job responsibilities and delegated duties they acted in a reasonable prudent manner to protect Cooksey from the risk of the harm which befell him. The verdict of the jury is therefore manifestly erroneous insofar as it found that Fusilier and Thiels were negligent, and, to that extent, it is reversed.
Clarius, on the other hand, knew that the line was energized but neglected to protect Cooksey from this danger. Clarius denied knowing that the line *248 was energized prior to the accident. After reviewing the record, we conclude that there would be no manifest error in the jury's believing Fusilier's testimony that Clarius was informed. Moreover, even if Clarius had no knowledge that the line had been energized, it was his assigned duty to know. He was specifically charged with seeing that Cooksey's crew did not work on energized apparatus. He was delegated not only the specific duty of keeping the crew out of the energized areas, but with being present and supervising all work near energized facilities. This is not an instance of a general supervisor not knowing of a specific hazard in the area of his general supervision. His duties and his relationship to Cooksey gave him a duty to know or to find out which lines were energized and to warn Cooksey of the risk of harm. That he viewed this duty with indifference is revealed by his testimony:
"Q. Now, when had you learned that Mr. Chism with the permission of Cleco had energized and/or backfed the circuit from pole (C) into the sub-station?
A. I didn't know that this line was finished until after the accident. They were working on them poles, on pole (C) on Wednesday, I believe it was and I did know and so did everybody else know they was bring in the line to that sub-station from that. That was the idea of them working out there.
Q. You knew they were physically going to bring in a line, did you not?
A. That is correct.
Q. And you knew that they were going to energize it or back-feed it?
A. No, it didn't make me any difference, sir.
Q. It didn't?
A. No.
Q. Why didn't it?
A. Because my men have specific instructions never to touch any wires either coming in or out of the substation.
Q. What about if they accidentally touch them?
A. They got no business accidentally touching them ..."
Instead of going to the Buhlow's substation to supervise Cooksey's crew, Clarius sent them into the energized substation alone. We, therefore, find that there is no manifest error in the jury's verdict that Clarius was negligent.
The defendants also contend that the jury erred in finding that Cooksey's attempt to check for static electricity was contributory negligence. We disagree for the following reasons. Contributory negligence is a question of fact to be determined by the judge or jury. Odom v. Hooper, La., 273 So.2d 510 (1973). Cooksey's purpose in testing for static electricity was that if the gin-pole came into contact with the line charged with static electricity while they were moving the reclosure, the slight shock to the workers might cause them to lose control of the reclosure switch causing injury to themselves and damage to the equipment. Although defendant contends that a line charged with static electricity is no less dangerous than an energized one, the record shows that it was a common occurrence for men doing cold work to come into contact with this static electricity. While it would not injure them, it would frighten or surprise them and cause them to drop equipment or fall, thereby injuring themselves or damaging the equipment. There is no evidence in the record that static electricity can cause serious injury. In fact, both Cooksey and a fellow employee testified that Clarius had instructed them on the manner in which to check unenergized lines for static electricity. Finally, Cooksey's whole working experience with Cleco led him to *249 believe that the line was not energized. He had never been allowed to work near energized lines unsupervised, and he knew they were constructing cold work to transmit electricity out of the substation. The switches which would have connected the addition to the older energized part of the substation were clearly not connected. He knew that there was no need to back-feed into the substation and that there were no customers to be supplied with electricity. He was, therefore, justified in believing that the line contained only harmless static electricity. Thus, there is no manifest error in the jury's finding that Cooksey was not chargeable with contributory negligence.
The final issue for disposition is the amount of the damages awarded by the jury. Much discretion must be left to the judge or jury in cases of damages caused by offenses or quasi offenses. The damages assessed should not be disturbed unless the appellate court's examination of the facts reveals a clear abuse of discretion. Each case is to be evaluated on the basis of its own peculiar facts and circumstances as to the damage caused by the injury. Miller v. Thomas, 258 La. 285, 246 So.2d 16 (1971); Brouillette v. State of Louisiana, through Department of Highways, 275 So.2d 196 (La.App. 3rd Cir., 1973).
The jury verdict was broken down as follows:
"If you find any or all of defendants negligent and plaintiff not negligent you must fix damages plaintiff is entitled to. How much general damages are due? These will include:

a) Pain, suffering, disability and
impairment and disfigurement $408,000
b) How much special damages
as follows:
c) Medical expense (Doctor
Bills) $ 3,000
d) Medical expense (Hospital) $ 9,000
e) Loss of earnings, to present
time $ 30,000
f) Loss of earnings, future" $200,000
 _________
 $650,000

The award of medical expenses of $12,000.00 was within the jury's discretion. Past medical expenses totaled approximately $10,000.00, and Cooksey will probably have to undergo another operation to remove a neuroma from his stump.
Plaintiff was 43 years of age at the time of the accident. We estimate his loss of earnings at approximately $140.00 per week. He has a life expectancy of about 28.5 years. LSA Tables, Table 6, Page 605. His injury occurred December 12, 1969. The jury's verdict was returned November 22, 1972, almost three years later. The plaintiff is uneducated and unable to do any other work. Dr. G. L. Hovnatanian testified that he was totally and permanently disabled. We conclude that the loss of earnings past and future should be reduced to $220,000.00.
We are likewise of the opinion that the award for pain and suffering, mental anguish, impairment, and disfigurement is excessive. We believe that an award in the sum of $143,000.00 in the instant case is more in conformity with the jurisprudence on the subject. The total award as amended above totals $375,000.00.
For the foregoing reasons the verdict and judgment of the district court is reversed insofar as it found defendants' Carroll Fusilier and Martin Thiels liable to plaintiff Chester L. Cooksey, affirmed insofar as it found defendants Johnny Clarius and his insurer Continental Casualty Company liable to Chester L. Cooksey, and amended to reduce the total judgment from $650,000.00 to $375,000.00.
Affirmed in part; reversed in part; amended in part.
MILLER, J., concurs with written reasons.
*250 MILLER, Judge (concurring).
I agree to the reduction of the award to $375,000, but would apportion the award differently.
The trial jury awarded $30,000 for loss of past earnings and $200,000 for loss of future earnings, for a total of $230,000 to cover loss of earnings. The majority has reduced this award to $220,000. Although plaintiff amended his pleadings shortly before trial, he appraised his claim for loss of past, present and future earnings at $150,000. I am impressed by the fact that plaintiff appraised his total loss of earnings at $150,000, and would reduce the award for loss of past and future earnings to that amount. In my view, $150,000 is an extremely liberal award for the loss of earnings as proved by Cooksey.
Cooksey was 44 years old when injured, and earned approximately $7,000 per year. There was no evidence to show Cooksey's worklife expectancy or a proper discount rate to be applied to the present receipt of future earnings.
The $30,000 awarded (for past earnings) covered a period of approximately three years during which Cooksey would have earned almost $21,000. If Cooksey could have worked through age 75, the award of $200,000 for loss of future earnings was excessive. That sum deposited at 7% interest would yield an annual income substantially in excess of Cooksey's earnings. And if that sum was deposited, the entire amount would be in Cooksey's estate at death.
A reading of the record leads me to believe that the jury resented some testimony offered by defendants and awarded punitive damages for plaintiff's pain, suffering, disability, impairment and disfigurement. The award for those items should be reduced from $408,000 to $213,000. The lower figure is on the high side. I would affirm a substantially smaller verdict had the jury appraised the damages at a lesser sum.
I respectfully concur in the reduction of the total award from $650,000 to $375,000.