295 So.2d 540 (1974)
Ben MUDD on behalf of the community and Olga Mudd, Plaintiffs-Appellees,
v.
TRAVELERS INDEMNITY COMPANY, Defendant-Appellant.
No. 4487.
Court of Appeal of Louisiana, Third Circuit.
May 17, 1974.
Rehearing Denied June 26, 1974.
*542 Camp, Carmouche, Palmer, Carwile & Barsh by Harry E. Barsh, Jr., Lake Charles, for defendant-appellant.
Scofield, Bertstedt & Gerard by John B. Scofield, Lake Charles, for plaintiffs-appellees.
Before FRUGÉ, HOOD and WATSON, JJ.
WATSON, Judge.
Plaintiff, Olga Mudd, filed this suit to recover damages for personal injuries she received on November 27, 1971, while operating a lawn mower owned by her son-in-law, Roland J. Trosclair, Jr., at the latter's farm in Ragley, Louisiana. Plaintiff, Ben Mudd, is the husband of Olga Mudd and joined in the suit to recover his wife's medical expenses. Defendant, Travelers Indemnity Company, is the liability insurer of Trosclair. Roland J. Trosclair, Jr. is a resident of Cameron Parish, and the farm in Ragley is not his primary residence but rather a country home.
It was stipulated between the parties that Mrs. Mudd's medical bills amounted to $1,956.59. It was also stipulated that Travelers insured Trosclair against public liability to the extent of $25,000.00.
The suit was tried in Cameron Parish before a jury which brought in a unanimous verdict in favor of plaintiffs as follows:
 SPECIAL VERDICT OF JURY
QUESTION ANSWER
1. Was Roland J. Trosclair Jr., negligent and, if
 so, was such negligence a proximate cause of the Yes 
 accident? (Yes or No)
2. Was Ben Mudd contributorily negligent and, if
 so, was such contributory negligence a proximate No 
 cause of the accident? (Yes or No)
3. Was Olga Mudd contributorily negligent and, if
 so, was such contributory negligence a proximate No 
 cause of the accident? (Yes or No)
4. Did Olga Mudd voluntarily assume the risk of No 
 the accident involved in this case? (Yes or No)
5. What was the amount of damages, if any, that
 were sustained by Olga Mudd as a result of the
 accident. $15,000. 
6. What was the amount of damages, if any, that
 were sustained by Ben Mudd as a result of the
 accident? $2,000. 
 /s/ Bobby R. Vincent
 Foreman
Cameron, Louisiana
May 25, 1973.
A judgment was rendered in accordance with the jury's findings.
Defendant, Travelers Indemnity Company, has appealed from the judgment in favor of plaintiffs.
Counsel for Travelers Indemnity Company states in brief that the issues presented on this appeal are: (1) whether Trosclair was negligent and, if so, was such negligence the proximate cause of the accident; *543 (2) were Ben and Olga Mudd contributorily negligent so as to bar their recovery herein, and/or make Ben Mudd liable as a third party defendant for indemnification or contribution; (3) did the Mudds' voluntarily assume the risk of the accident involved herein; and (4) were the damages awarded Mrs. Mudd excessive.
As to number one, the negligence of Trosclair, Mrs. Mudd, a fifty-four year old housewife, testified that she was injured when the mower ran over her when she got off of it to move a hose. The evidence indicates that the mower jumped from neutral into forward gear after she dismounted and that this was the cause of her injury. Mr. Earl Mouton, owner of the Cameron Western Auto Store for five and a half years and a diesel mechanic for eleven years prior to that, testified that he services and sells Wizard riding lawn mowers and sold the Wizard 8 horsepower riding lawn mower in question to Roland J. Trosclair, Jr. in May of 1969. He testified that he examined this particular mower on April 15, 1972, at his store and found: that the throttle cable was broken; that the brakes would not catch, and would not hold; that the transmission needle was very loose causing the machine to go in and out of gear; that the mower could go in and out of gear because of vibration; and that the safety guard on the blade housing was broken off, leaving an opening to the blade. He stated that the model in question had been redesigned in accordance with government safety standards and that the present model Wizard mower has safety switches which prevent it from vibrating out of neutral into gear. He further testified that he had owned a mower similar to the one he sold to Trosclair and that he had known it to vibrate into gear. Mr. Mouton was proposed a hypothetical question as follows:
"Suppose you had a lady on a Wizard mower that you sold in 1969, and suppose on November 27, 1971, this woman was operating this mower and had put the mower in neutral, got off the mower it was stoppedgot off the mower, walked in front of it and was doing something in front of the mower and all of a sudden the mower began moving again and struck her. In your opinion what would cause that?" (TR. 334).
And he answered as follows:
"The transmission could go into gear. You have a long lever that came through underneath by the seat and it moves sideways, and the vibration can move it either way, reverse or forward, it can go into gear. Because the type gear, the way it's made, which is a beveled gear, it can run full speed forward and just without even pressing the clutch reverse and go backwards. The way the gears are made they can mesh." (TR. 334).
Mr. Mouton also testified that even if the brakes were in good condition and were on when the mower was stopped, the brakes would not keep the mower from starting up again if it went into gear. Mr. Mouton stated that, although the safest thing to do when getting off the mower was to stop it, he himself, when mowing his yard, gets off the mower without stopping it and then gets back on ". . . because I'm not going to stand there and crank the thing again." (TR. 358).
There is little question that the foregoing testimony was sufficient to convince a jury that the mower in question was dangerous and hazardous. Mr. Trosclair's mere ownership of that mower would not make him responsible for Mrs. Mudd's injuries. Mrs. Mudd's status on Trosclair's land was that of an invitee. The Mudds were staying at the Trosclair farm at the latter's request in order to care for the property during Mr. Trosclair's absence. Mr. Trosclair's duty to Mrs. Mudd was to warn her of any hidden or concealed perils of which she was unaware and of which Mr. Trosclair knew or should have known in the exercise of reasonable care. LSA-C.C. art. 2317, Champagne v. Northern Assurance Co. of America, 210 So.2d 68 (La.App. 1 Cir. 1968); *544 writ denied, 252 La. 831, 214 So.2d 159; Genovese v. New Orleans Public Service, 45 So.2d 642 (La.App.Orl.1950); Foggin v. General Guaranty Insurance Company, 250 La. 347, 195 So.2d 636 (1967). Mr. Trosclair testified that he took the lawn mower in question to his Ragley farm after using it two years "... because it was too small for my place in Cameron." (TR. 370).
As to the safety guard which Mr. Mouton testified was missing, Mr. Trosclair said:
"I took that off myself, because when you are cutting grass that is high or above normal cutting, the fact the guard, the way it was sitting on the housing of the mower, would not throw the grass through it. It would clog up." (TR. 371-372).
As to whether or not the Mudds knew the safety guard was missing, Mr. Trosclair said:
"That would be hard to notice unless you were really inspecting it real close. Some lawn mowers don't have them and some do." (TR. 376).
Mr. Trosclair also testified that it was always easy to put the lawn mower in and out of gear. He stated that in heavy grass the lawn mower would sometimes vibrate out of gear and that he had not ever told Mr. or Mrs. Mudd this fact.
It is clear from Mr. Trosclair's testimony that he was aware of dangers inherent in his lawn mower, in particular; he was aware that the safety guard was missing from the mower blade; and he was aware that the machine could vibrate out of gear. The jury could have well concluded that he should have been aware that it could also vibrate into gear. He did not warn Mr. and Mrs. Mudd of these perils and the evidence on this point was sufficient for the jury to conclude that Mr. Trosclair was negligent.
According to Mrs. Mudd's account of the accident, which was apparently accepted by the jury, her injuries occurred because the lawn mower vibrated into gear after she got off it and the blade struck her left knee and right toe. The nature of her injuries, in particular, the four inch laceration on her left knee, confirmed her account of the accident. The jury may well have concluded as a matter of fact that her injuries were the result of two defects in the mower of which Mr. Trosclair was aware and of which he failed to warn Mrs. Mudd, to-wit: the missing safety guard and the defective transmission. In our opinion, there is no manifest error in the jury's finding that Mr. Trosclair's negligence was thus the proximate cause of Mrs. Mudd's injuries.
As to issue number two, the question of contributory negligence on the part of Mr. or Mrs. Mudd, it is well settled that this is a question of fact to be decided by the trier of fact, in this case, the jury. Odom v. Hooper, La., 273 So.2d 510 (1973); Cooksey v. Central Louisiana Electric Co., Inc., 279 So.2d 242 (La.App. 3 Cir. 1973); Crum v. Holloway Gravel Company, Inc., 273 So.2d 566 (La.App. 1 Cir. 1973); writ refused, La., 276 So.2d 701. We find no manifest error in the jury's finding that Mr. and Mrs. Mudd were not guilty of contributory negligence. Mrs. Mudd testified that she had used the mower only once or twice before the occasion of her accident and that she was unable to start the mower herself; that her husband had to start the mower with jumper cables. She testified that she did not know much about machinery and was unaware of any defect or trouble with the mower other than the fact that it would not start. She also stated that she was unaware before her accident that the mower would jump gear. Karen Mudd, aged thirteen, and Terry Mudd, aged fifteen, who also operated the mower, corroborated their mother's testimony. Mr. Mudd also testified that he was unaware before the accident of any trouble with the mower *545 other than the starter. He further testified that he did not know of the missing safety guard on the blade outlet until after Mrs. Mudd's accident when: "Earl Mouton showed it to me." (TR. 303). He stated that, until the day of the accident, his wife and children had never operated the mower except when he was present; that they never got off the mower without killing the engine and calling him. All of the Mudd family said that, on the day of the accident, Mr. Mudd had started the mower and then he and the children had gone off to pick pecans, leaving Mrs. Mudd operating the mower. In view of the fact that both Mr. Trosclair and Mr. Mudd testified that Mr. Mudd was not told by Trosclair about the mower vibrating in and out of gear and the safety guard on the blade outlet being gone, the jury could and did conclude that there was no contributory negligence on the part of Mr. or Mrs. Mudd. The jury apparently believed the testimony of the Mudd family and Mr. Trosclair, as outlined above, as well as the testimony of Earl Mouton. There were no other witnesses and no significant discrepancies in the testimony. We find no error in the jury's finding on this issue.
As to issue number three, assumption of the risk of the accident by Mr. and Mrs. Mudd, this is, of course, an affirmative defense which must be proven by the party alleging it. In order to prove assumption of risk by Mr. and Mrs. Mudd, defendants here would have had to prove that they knew of the defective and dangerous condition of the lawn mower and used it in spite of that knowledge. The evidence was to the effect that they did not know of the danger. Defendant failed to discharge its burden of proof in this regard. Langlois v. Allied Chemical Corporation, 258 La. 1067, 249 So.2d 133 (1971).
As to the last issue raised by defendant-appellant, the quantum awarded Mrs. Mudd, we are mindful of the "much discretion" given the jury in assessment of damages. LSA-C.C. art. 1934; Miller v. Thomas, 258 La. 285, 246 So.2d 16 (1971); Gaspard v. LeMaire, 245 La. 239, 158 So. 2d 149 (1963); Ballard v. National Indemnity Company of Omaha, Neb., 246 La. 963, 169 So.2d 64 (1964); and Lomenick v. Schoeffler, 250 La. 959, 200 So.2d 127 (1967).
Reviewing the evidence as to Mrs. Mudd's injuries: Dr. David Drez, Jr., an orthopedic surgeon, saw her in the emergency room of St. Patrick's hospital on November 27, 1971, and stated that she had a smashed or comminuted fracture of the left kneecap with a four inch laceration and bone fragments visible in the wound. She also had a comminuted or smashed fracture of her right big toe as well as a fracture in one of the joints of her toe. He stated that her injuries were consistent with her being run over by a lawn mower. Dr. Drez performed surgery to remove her kneecap and repair the tendon and debrided and sutured the toe. Her knee was then placed in a cylinder or tubular cast from her upper thigh to just above the ankle and her toe in a "toe spika" (TR. 64) or little cast. Mrs. Mudd remained in the hospital until December 4, 1972 and was discharged on that date after being given instruction in crutch walking. On December 23, 1972, her cast and sutures were removed and there were signs of infection (inflammation and induration), so she was placed on antibiotics. On December 30, 1972, Dr. Drez noticed necrosis or dead skin in the right big toe and debrided the area. Mrs. Mudd was kept on antibiotics. Six months following her operation Mrs. Mudd had atrophy of the thigh muscle in her left leg of an inch or so. Dr. Drez stated that she had a 20% permanent physical impairment as to her left leg, as well as a permanent loss of motion in her right toe. She also has scar tissue on her left knee which may cause discomfort from time to time.
Dr. Charles Anderson also saw Mrs. Mudd on the date of the accident at the request of Dr. Drez who wanted an evaluation as to the feasibility of general anesthesia. *546 Dr. Anderson assisted in Mrs. Mudd's operation and later saw her in his office on February 1, 1972, when she was sent to him by Dr. Drez because of swelling in her ankles and knees. Dr. Anderson diagnosed Mrs. Mudd at that time as having traumatic arthritis as the result of her accident. He prescribed medication and felt that she had a 50% improvement on February 7, 1972, when he saw her again, although she still had difficulty walking. On February 21, 1972, Dr. Anderson saw her again and felt that the swelling was minimal as the result of her medication. However, he testified that her arthritis could be permanent.
Mrs. Mudd unquestionably endured a great deal of pain and has a permanent impairment of her left leg and right big toe as well as traumatic arthritis. The award to her of $15,000.00 was not an abuse of the "much discretion" of the jury.
For the foregoing reasons, the judgment of the trial court is affirmed.
Costs of the appeal are taxed against appellant.
Affirmed.
HOOD, J., dissents and assigns written reasons.
HOOD, Judge (dissenting).
I do not agree with the conclusions reached by the majority.
My colleagues have held that the jury "may well have concluded" that the injuries sustained by Mrs. Mudd resulted from two defects in the mowing machine, namely: (1) The safety guard was missing; and (2) the transmission was defective in that vibration of the motor would sometimes cause the machine to slip from neutral into gear. They hold that the jury "could have well concluded" that Roland J. Trosclair, Jr., "should have been aware" of these defects and was negligent in failing to warn Mr. and Mrs. Mudd of them.
In my opinion, the lack of a device which plaintiffs call a "safety guard" on the machine had nothing to do with the accident or with the injuries sustained by Mrs. Mudd. The device they refer to was not designed to and did not serve to protect people from injury. There was an opening on one side of the metal housing over the blade which served as a "chute" for discharging grass as it was being cut. This chute extended a few inches from the housing, and the so-called "safety guard" was simply a bar or strip of metal which ran across the opening of the chute, near the bottom of the housing. The purpose of it was to hold the machine up and thus protect the blade from damage if the mower ran over a branch or a raised object as it was being used. Mr. Trosclair found that this metal bar obstructed the discharge of grass through the chute when the mower was used to cut high grass, and for that reason he removed it. He explained, however, that some mowers are equipped with a bar of that type and others are not. It was perfectly obvious to Mr. and Mrs. Mudd, or to anyone else who looked at the mower, that there was no bar across the opening, and I think my colleagues have erred in finding that plaintiffs were not aware of that condition. I agree that they were unaware of the fact that the mower had been equipped with such a bar originally, but they knew that it had no bar across the chute while they were using it, and it was unnecessary for Trosclair to tell them that no such bar was on the machine.
Even if the so-called "safety guard" had been intended to protect persons from injury, the lack of such a device on this mower had nothing to do with this accident. Mrs. Mudd explained that she stopped the mower, raised the blade and stopped the blade from turning before she got off of the machine immediately before the accident occurred. She stated that after taking that precaution, she then got off the mower, walked in front of it and as she was bending over the mower moved forward and struck her on the back of her legs, and "knocked me to my knees." She stated *547 that the mower then ran over her legs, but she explained that the blade was not turning. The evidence makes it clear that plaintiff's injury was caused by her fall, and not by the blade of the machine.
The majority states that "the blade struck her left knee and right toe" at the time of the accident. I fail to find one single statement in the entire record to that effect. I believe the majority obtained that erroneous impression from the testimony of Dr. David Drez, Jr., who treated Mrs. Mudd shortly after the accident occurred, and who stated:
"What she told me she said around 2 o'clock on 11/27/72 she was riding on a lawn mower and she was thrown from the lawn mower while it was still in gear, and she was thrown down, hit her left knee and also hit her toe."
I point out that Dr. Drez did not quote Mrs. Mudd as stating that the blade struck her. Mrs. Mudd denies that she told Dr. Drez that she was thrown from the lawn mower, but she has never stated that the blade played any part in her injuries. On the contrary, she explained that her husband always made her "stop the blade from turning" before she got off the mower, that "You don't want to leave your blade turningwe never have had an accident except that one but if the blade would have been turningif I hadn't have raise it, it would have probably cut both of my legs off."
The evidence thus shows that the "safety guard" had nothing to do with the accident or injury. Even if it had, however, there is no reasonable basis for holding that Mr. Trosclair was under a duty to tell Mr. and Mrs. Mudd that there was no bar across the open end of the chute of the mower, since that fact was obvious to anyone who looked at the machine.
Turning now to the alleged defect in the transmission of the mowing machine, I think the evidence fails to show that the mower slipped into gear at the time the accident occurred. It shows that this had never occurred at any other time, either before or after the accident. Mr. Trosclair had used the mower for almost two years, and Mr. Mudd had been using it constantly, as often as two or three times a week, for a period of almost five months before this accident occurred. In all of that time the transmission had never jumped into gear. Shortly after the accident occurred, the insurance adjuster who investigated plaintiffs' claim started and ran the mower in the presence of plaintiffs, and he was unable to make it go into gear without forceably engaging the gear by hand. Mr. Mouton, the expert who examined the mower after the accident, did not start the mower, and he conducted no experiment of any kind to determine whether vibration would cause it to slip into gear. He explained that such a thing could happen, but that it would be an unusual occurrence.
Neither Mrs. Mudd, nor anyone else, was able to say that the mower moved into gear. Plaintiffs merely assumed that it did because it began moving forward after it had been stopped. The evidence shows that the mower would roll freely if it were on a slope, and that it stopped when it struck a tree. After striking the tree the motor continued to run for a period of almost 30 minutes before it was turned off by Mr. Mudd, but there is no indication that the wheels were turning during that time. Mrs. Mudd stated that the motor continued to run at its regular speed, and there was no difference in the sound of the motor while it was idling before the accident, when it started to move forward just before it struck her, and while it was stopped in front of the tree.
Assuming, however, that the jury was justified in finding that the motor did slip into gear while the machine was idling, the question presented is whether Mr. Trosclair knew that such a thing was possible or likely, and if so, whether he was under a duty to warn Mrs. Mudd of it. Since that had never occurred before, Mr. Trosclair *548 had no reason to suspect that it would slip into gear. He stated that it had "vibrated into neutral" when he used it in Cameron, but he explained that he weighed 250 pounds, and that the mower would jump "out of gear" when he was in high grass and when the mower would get clogged up. He felt that it was due to a combination of the high grass and his own weight that it would jump out of gear There, of course, is nothing dangerous about the mower slipping out of gear. The machine merely stops when that occurs.
The majority held that "the jury could have well concluded that he (Mr. Trosclair) should have been aware that it could also vibrate into gear." I do not think that such a holding is justified. If Mr. Mudd had been unable to detect the alleged defect during all the time he used the mower, it is unreasonable to hold that Mr. Trosclair should have detected it. Mr. Mudd was a pipefitter. He had worked for many years as an oilfield driller and roughneck, and he testified that he was thoroughly familiar with machinery and mechanics. I think it is unreasonable to hold that Trosclair should have discovered and warned Mr. Mudd of the fact that the machine would jump into gear, and at the same time to find that Mr. Mudd was not negligent in having failed to discover the same thing.
I also disagree with the majority in their finding as to the duty which Trosclair owed to Mr. and Mrs. Mudd. I agree that plaintiffs were invitees on Trosclair's premises. Mrs. Mudd's injury, however, was not sustained because of any defect in the premises. She was injured because of an alleged defect in the mower, a movable, which was loaned to the Mudds after they began occupying Trosclair's premises. Mr. and Mrs. Mudd had been living on those premises for several months before this accident occurred. It was their home. They were not paying rent and thus they were not lessees, but they clearly were the "occupiers" of the premises. The mower was not a part of the premises. It simply was loaned to the Mudds after they moved to Trosclair's farm. If the majority feels that the claim here turns on the question of the duty of an invitor to an invitee, then they apparently overlooked the fact that the "occupier," as well as the "owner," of premises owes a duty of care to the invitee. If the machine is to be considered as a part of the premises, then Mr. Mudd, as the occupier, had the same duty as did Trosclair to discover and warn of hidden defects in the mower.
In my opinion the relationship between Trosclair and the Mudds was that of lender and borrower. The transaction between Trosclair and the Mudds relating to the mower was a "loan for use," and it is governed by Articles 2893-2909 of the Civil Code. Article 2909 provides:
"Art. 2909. When the thing lent has defects of such a nature that it may occasion injury to the person who uses it, the lender is answerable for the consequences, if he knew the defects and did not apprise the borrower of them." (Emphasis added).
In Lancaster v. Jordan Auto Co., 121 F. 2d 912 (5 Cir. 1941), an automobile dealer loaned a car to the plaintiff for her to use until the automobile which she had ordered came in. The brakes of the loaned automobile were defective, causing plaintiff to sustain injuries. In determining the duties of the lender to the borrower, the court said:
"An essential condition in a contract of lease is a fixed sum to be paid as rent. La.Civil Code, Arts. 2669, 2670. Loans are dealt with in Title 12, La.Civil Code, art. 2891 et seq. Loans are gratuitous. Art. 2894. In a loan for use, if the thing lent has defects that may occasion injury to the person who uses it, the lender is answerable for the consequences, if he knew the defects and did *549 not apprise the borrower of them. Art. 2909. This is substantially the same as the obligation of a bailor where the bailment is gratuitous. 6 Am.Jur. 286, `Bailments' § 193. It may be assumed the lending of the car was an accommodation to both parties but the Jordan Company did not intend to charge for its use and it would be unreasonable to say payment for its use was included in the price of the new car. We conclude that the transaction was a loan under the law of Louisiana. The Jordan Company did not know of any defects in the car. It is not shown any existed. There was no breach of duty on the part of appellee." (Emphasis added).
Although the term "bailment" is not used in the Louisiana Civil Code, our courts have used it occasionally, and have interpreted that term to mean either a "lease" or a "loan for use" of movable property, depending on whether a price was paid for the use of the movable. In Dore v. Hartford Accident and Indemnity Co., 180 So. 2d 434 (La.App. 3 Cir. 1965), for instance, we compared the loan of an automobile to a "gratuitous bailment." With reference to the duty which the lender owed to the borrower, we said:
"The general rule in most jurisdictions is that where a bailment is purely gratuitous and for the exclusive benefit of a bailee, the bailor's only duty in respect to defects is to inform the bailee of any defects of which he has actual knowledge and which might make the use of the vehicle hazardous."
* * * * * *
"As is indicated by the annotation in 46 A.L.R.2d 430-433, Section 10(b), a few states have made extensions or modifications of the general rule that the gratuitous bailor may be held liable only for dangerous defects actually known and not communicated to the bailee. A few cases cited and discussed there hold gratuitous bailors liable also for defects of which they should have known in the exercise of reasonable care. This is termed `constructive knowledge'."
* * * * * *
"Even if we were to extend the general rule in Louisiana to include defects of which the gratuitous bailor should have known through reasonable care, a legal conclusion which we do not hold in the present case, the plaintiff would not prevail. The facts clearly do not show that the defect in Romero's brakes was one which the ordinary private automobile owner should have known, by using the car, or by the unknowledgeable inspection which the ordinary automobile owner makes of the vehicle he drives." (Emphasis added).
Other cases which seem to establish that where there is a loan for use or a gratuitous bailment, the only duty of the lender in respect to defects is to inform the bailee of any defects of which he has actual knowledge and which might make the use of the vehicle hazardous, are the following: Bailey v. Simon, 199 So. 185 (La. App.Orl.1940); Fontenot v. Fontenot, 150 So. 40 (La.App. 1 Cir. 1933); Sears v. Interurban Transport Co., 14 La.App. 343, 125 So. 748 (La.App. 2 Cir. 1930).
As pointed out in the Dore case, in some jurisdictions it has been held that if the loan for use of a movable is for the mutual benefit of the lender and the borrower, then the lender is under a duty not only to warn the borrower of any dangerous defects in the movable of which he has actual knowledge, but he also is required to determine by means of a simple inspection as to whether it has any such defects.
In the instant suit the evidence is clear that Trosclair did not have any actual knowledge of a defect in the mowing machine which would cause it to jump into gear because of the vibration of the motor. *550 If we hold that he was required to make a simple inspection to discover defects before he loaned the mower, then my view of the evidence is that a simple inspection would not have revealed that defect, if in fact such a defect ever existed. There is no basis, therefore, on which to hold that Trosclair was negligent in failing to determine that it would jump into gear and in failing to warn the Mudds of that fact.
My colleagues have also found that Mrs. Mudd was free of contributory negligence. I think she was negligent. She testified that she and her husband owned a similar machine and that "I knew how and I never asked" for instructions as to how to operate this particular machine, and that she never read an instruction book as to the use of those machines. She walked in front of the mower and stooped down with her back to it while the machine was idling and knowing that there were no brakes on it. Mr. Mudd testified that he never permitted his wife or any of his children to operate the mower when he was not present, except on the day the accident occurred. He stated that "whenever I got off it, or anybody got off it, we killed it (the engine)," and that on all other occasions except the date of the accident when his wife or children wanted to get off the mower they "hollered" at him, and he would see that the engine was killed. Mrs. Mudd knew, therefore, that it was not safe to get off the mower while the engine was running. Mr. Mouton, the expert on mowers, stated that "That would be the safe way to do it, anytime you get off to stop the thing," and that "You just have to not get off it and in front of it," although he concedes that he violates that safety precaution.
In my opinion, the majority has erred in finding that Mr. Trosclair was negligent and that the plaintiffs were free from contributory negligence.
For these reasons, I respectfully dissent.