BOUTALL, Judge.
This is a claim for personal injuries by an employee arising from an accident which occurred while on the job, and it is brought in tort against six (6) defendants who are officers and supervisory employees of plaintiff’s employer, together with their insurer. A trial by jury was had and the jury returned a verdict for plaintiff and against three (3) of the officials and their insurer in the amount of $75,000.00, subject to a credit for workmen’s compensation and medical benefits paid. A verdict was rendered in favor of three (3) of the defendants dismissing plaintiff’s claim against them. This appeal is by those officials and the insurer cast in judgment.
The testimony in the case is fairly well uncontradicted, and the basic issue is the application of the pertinent law relative to the liability of corporate officials and supervisory personnel.
The facts are that the plaintiff was engaged in loading steel from the employer’s yard into a truck, along with two (2) other men. The operation was as follows. The steel to be loaded was channel beams of some 40 feet in length, and they lay in a stack, secured in bundles, in the yard. A mobile crane, installed upon a heavy truck frame, was pulled into position next to the stack of channel beams, and the flat bed truck to be loaded was pulled alongside the crane away from the pile of beams, and facing in the same direction as the truck portion of the crane. This enabled the crane operator to swing to his left, pick up some beams, which were hooked on by plaintiff, and then swing the load 180 degrees to his right and deposit the beams on the flat bed of the truck. Plaintiff helped to guide the beams as the crane traversed its arc of motion and to straighten the beams out so that they could be properly laid on the truck bed, whereupon the truck driver would unhook the beams and the process would be repeated.
Although plaintiff’s testimony is to the effect that the truck had not been completely loaded, the testimony of everyone else is to the effect that the loading opera *457 tion had been completed, and the crane was in the process of being secured for the night. As the crane operator attempted to lower the crane boom into position for the night, it descended out of control and smashed the plaintiff, who was standing beneath the boom, to the ground, causing him severe injuries.
The main witness as to how the accident occurred is the crane operator, Clarance Cooksey. Plaintiff, due to the severe injuries he sustained, did not remember the facts of the accident. The last fact he remembered was standing at the rear of the flat bed of the truck and he remembered nothing more until he regained consciousness in the hospital. The truck driver, Charles Fury, testified that after the last beams were unloaded on the truck, he climbed over to the front of the truck and was attempting to get into the cab to move the truck away, and so he did not see what took place either. He testified that the last time that he saw plaintiff was when plaintiff was standing at the rear of the flat bed of the truck. Cooksey, himself, while he explained in detail his activities and what took place in connection with the crane, had his attention fastened on the end of the crane boom, as was his practice, and could not explain how plaintiff got from the rear of the truck to the place where the boom was being lowered. Accordingly, there is no explanation for plaintiff being beneath the boom when it was attempted to be lowered.
Cooksey’s testimony is that after they had loaded the last beam, he noted that plaintiff was leaning against the rear end of the trailer. He then pulled the block of the crane up near the end of the boom, preparing to secure the crane for the night. After he did this, he swung the boom 90 degrees counterclockwise, so that it was facing directly aft, or away from the truck or the cab portion of the crane unit. He then proceeded to lower the boom, intending to secure it about 10 to 15 feet from the ground, as was his customary practice. He gave no signal that he was lowering the boom. While swinging and lowering the boom, Cooksey kept his attention on the tip of the boom. As the boom swung down, it proceeded to come down too fast and Cooksey was unable to stop the descent of the boom, even though he applied the foot brakes. As the boom was coming down, for the first time he noted that Dever was directly under the boom, and perceiving that the boom would apparently strike Dever, Cooksey yelled to Dever to “watch it” or words to that effect. His yells were heard by Fury. Dever ducked over in an apparent attempt to avoid the boom, but the boom struck Dever a glancing blow on the head and knocked him down. The boom continued down and struck the ground with sufficient force to fracture the boom.
Cooksey testified that as the boom commenced its faster than normal rate of descent, he noticed that the gears and chains were still turning, indicating that the clutch to the boom was still in gear. The effect of the clutch still being engaged is similar to that of the clutch in an automobile descending an incline, wherein the clutch exercises a slowing or braking effect upon the vehicle. Similarly, the engagement of the clutch while the boom was being lowered would have the effect of slowing the descent of the boom inasmuch as it was pulling against the gears and cable.
Cooksey was unable to explain the rapidity of the boom descent, and testified that he did everything in accordance with normal procedure, and such an event had never occurred before. He noted that upon leaving the cab of the crane after the accident, that the air pressure gauge showed only 20 pounds, which was considerably below the normal operating pressure of 80 pounds per square inch. The clutch system is operated by air pressure; however, the brakes were manually operated. The evidence of both Cooksey, and Joseph W. Brown, the Superintendent of Shops, under whom Cooksey worked, was that after the accident, when Cooksey started up the *458 crane to find out what went wrong, the air pressure built right back up to 80 pounds per square inch. They found nothing wrong with the crane, except, of course, for the fractured boom, and were unable to ascertain what went wrong.
It is the contention of plaintiff that the crane failed because of the malfunction or hanging open of an air pressure release valve, called an exhaust port, in the pneumatic clutch system. Plaintiff produced an expert witness, L. L. Denson, a mechanical engineer, who testified that, under the circumstances as set out above, the failure of this particular valve would cause the air pressure to be lowered, such that the clutch would not be engaged, or only slightly engaged, and thus the boom would be falling practically free. Such a malfunction is commonly caused by the entrance of dirt, rust or other foreign objects into the air supply, and that such foreign matter could cause the valve to stick open on occasions. He stated that a regular and proper maintenance system could prevent such occurrences.
It is plaintiff’s theory of the case that the statutory law requires safe working conditions and the exercise of extreme caution in the operation of cranes, and that the failure to set up a regular, periodic maintenance system for this particular crane, together with the failure to instruct employees in the proper use of signals for its operation, constitute violations of the law. Accordingly, it is argued that the officials and supervisory employees of the company owed a duty to its employee, Dever, to provide a safe place to work, and that their failure to install such a program, and to adequately supervise the operation of the crane, constitutes negligence, thus making the individual officers and supervisory personnel liable in tort.
In support of his position, plaintiff refers us to the provisions of LSA-R.S. 40:1672 and 40:1682 which state as follows :
“§ 1672. Scaffolds, supports, or other mechanical contrivances
All scaffolds, hoist cranes, stays, ladders, supports, or other mechanical contrivances erected by any person for use in the erection, repairing, alteration, removing, or painting of any building, bridge, viaduct, or other structure shall be constructed, placed, and operated so as to give proper and adequate protection to any person employed or engaged thereon or passing under or by. it, and in such a manner as to prevent the falling of any material that may be used or deposited thereon.”
“§ 1682. Communication system for mechanical elevating machines or hoisting apparatus used in construction work
If elevating machines or hoisting ap-partus, operated or controlled by other than hand power, are used in the construction, alteration, or removal of any structure, the owner, contractor, or subcontractor shall, during the use and operation of the elevating machine or hoisting apparatus, provide and maintain an adequate system of communication by signals, so that prompt and perfect communication may be had at all times between the operator of the engine or motive power of the elevating machine or hoisting apparatus and the employees or persons engaged thereon or using or operating it. The officers of the city charged with the enforcement of the building laws shall enforce this Section. If such officers fail to do so, the police authorities shall, pursuant to the terms of this Part, enforce the provisions of this Section.”
Plaintiff contends that it was the intent of this statute to impose strict liability upon all persons who might be responsible for the use of hoist cranes and refers us to the cases of Kempff v. B. E. King & Sons, Inc., 222 So.2d 921 (La.App. 4th Cir., 1969), and Barilleaux v. George D. Mattix, Inc., 202 So.2d 461 (La.App. 4th Cir., *459 1967). Additionally, he asserts that there is a general duty upon executive officers and supervising officials towards other employees to provide them with a reasonable safe place of work. He refers us to the following language in the case of Chaney v. Brupbacher, 242 So.2d 627 (La.App. 4th Cir., 1970):
“In our opinion the obligation of an employer and, within the limits of their authority, of its supervisory personnel towards workmen is to provide them with a working place and conditions which are reasonably safe consdiering the nature of the work * * * Owens had the obligation, and the obligation is not fulfilled by providing an unnecessarily unsafe place and conditions and warning the workmen of the danger, especially when safety could so easily and inexpensively have been had. Having set the stage, for a slip of the crane boom to kill Chaney, Owens’ negligence was a proximate cause of Chaney’s death.” (242 So.2d at 631)
Of course, there is a difference in the duties of the various defendants who were sued, and to this extent the job obligations of each of them would apply somewhat differently to any obligations that may be owed to the plaintiff. Plaintiff contends to us that where an obligation is owed to another employee, it makes no difference if the breach of that duty by an executive officer of the corporation is caused by an act of malfeasance, misfeasance or nonfea-sance. We are referred to the statement of the court in the case of Berry v. Aetna Casualty & Surety Company, 240 So.2d 243 (La.App. 2nd Cir., 1970). Writ ref., 256 La. 914, 240 So.2d 374:
“Whether the acts of an executive officer amount to malfeasance, misfeasance or nonfeasance is immaterial. Plaintiff must show negligence on the part of one or more of the defendants as provided in Louisiana Civil Code Articles 2315 and 2316, the basic authority for such claims in this State. * * * ” (240 So.2d at 247)
That court relied on the case of Adams v. Fidelity and Casualty Co. of New York, 107 So.2d 496, 501-502 (La.App. 1st Cir., 1958) and quoted the following:
“We do not believe that any of the authority cited by the defendant can be interpreted as holding the corporate officer free from any liability for the violation of a legal obligation due and owing to a plaintiff where the latter’s injury is traceable to such breach by the corporate officer. Whether the breach is due to misfeasance, malfeasance, or nonfea-sance, is immaterial and beside the point. Just so there is the breach of an individual obligation by the corporate officer due to a party and as a result of such a breach, the latter is injured, would be sufficient to give rise to a cause of action by the injured party against the corporate officer.” (240 So.2d at 247)
As opposed to these contentions of plaintiff, the defendants urge that there was no negligence on the part of the officials, and that if there were any legal duty owed by the defendant officers, the legal duty was owed exclusively to the corporation and is of no concern to a third party employee, and gives no rise to a cause of action in tort. The only duty owed by an executive officer to a third party is to exercise that due care not to injure him which any person owes to another. In this regard we are referred to the following cases: Wirth v. Albert, 174 La. 373, 141 So. 1 (1932); Maxey v. Aetna Casualty & Surety Company, 255 So.2d 120 (La.App. 3rd Cir., 1971); Johnson v. Continental Ins. Co., 216 So.2d 336 (La.App. 4th Cir., 1968); Daigle v. Cobb, 175 So.2d 392 (La.App. 4th Cir., 1965).
With these opposing contentions before us, we now focus our attention upon the capacity of each of the defendants to determine if there was a duty owed and whether there was a breach of that duty. This having been a jury trial, there are no findings of fact or reasons for judgment to aid us in our consideration of the record.
*460 The defendant officers cast in judgment were Christian M. Voelkel, President and Chief Executive Officer of Dixie Machine Welding & Metal Works, Inc., A. J. Mura, Safety Director of the corporation, and Joseph W. Brown, Superintendent of Yards, who was in charge of the Race Street Yard, wherein the accident occurred. None of these persons were present at the time of the occurrence nor did they give any orders or do any act directly connected with the crane operation that took place and led to the accident.
Mr. Voelkel had been President of the corporation since 1963 and was responsible for the over-all operations of Dixie, which has several divisions, each exercising a different business operation. The particular division which operated the Race Street Yard was the Welding and Manufacturing Company whose main purpose was fabrications of steel in the shop to be delivered to other contractors for erection or installation. It was one of the president’s duties to set up maintenance systems for the upkeep of all of Dixie’s equipment.
Safety Director Mura had general supervision over the safety of Dixie’s operations. Since Dixie engaged in a number of large operations over a widespread area, he could not supervise any particular operation exclusively, but visited all in turn. It was his duty to hold regular meetings with supervisory personnel to instruct them in safety procedures, and to publicize safety information to all employees. He inspected as much of the actual operations of the company as he could and had the authority to stop any unsafe practices or correct any hazardous conditions that he observed.
Superintendent Brown was in direct supervision of the Race Street Yard and of all operations there. He was in charge of the particular crane and workmen involved here. He was responsible for the proper maintenance and operation of the crane.
The evidence shows that there was no regular, periodic maintenance program adopted for this crane, and it is argued that each of these officials knew that one should be adopted to keep the crane in safe operating condition, and although each had the authority to install such a program, he failed to do so. While we agree that each held such authority, we do not conclude that any of them was guilty of negligence toward the plaintiff employee.
The evidence shows that the president assigned the superintendent the job of inspection and maintenance of the crane. The superintendent visually inspected it from time to time but depended mainly upon the crane operator, Cooksey, to inspect the crane and inform him of any difficulties. All testify that there had been no problem with the crane for several years, except some difficulty with the motor part of it. Only once had there been any difficulty with the air system, and that was a leaking diaphragm which had been satisfactorily repaired. The crane had been working satisfactorily and there was no reason for expect any trouble this particular day. Additionally, the crane worked satisfactorily after the accident and the cause of the falling boom could not be ascertained.
The testimony of the expert produced to establish the cause of the fall was, of course, predicated upon hypothetical questions. The hypothesis was based on the fact that the boom was falling free and that the clutch was not engaged. However, this does not correspond to the testimony of the only fact witness, the crane operator, who testified that the clutch was engaged. This could lead to a conclusion that operator error, not machinery failure was the cause of the boom falling.
However, presuming that the jury concluded that machinery failure was the cause, we cannot conclude that the defendants had reasonable grounds to know that the air system would fail. The evidence discussed above shows that the crane was cared for, although not in the fashion contended for by plaintiff, and that it worked *461 satisfactorily. Additionally, plaintiffs expert testified that even under his system of maintenance a similar failure could occur.
Assuming arguendo that a regular, periodic inspection is a better system, we cannot say as a matter of law that defendants owe to plaintiff the highest degree of care possible, or that they are insurors of his safety. The duty owed by corporate executives to an employee is to use due care not to injure him. LSA-C.C. art. 2315 et seq.; Maxey v. Aetna Casualty & Surety Company, supra; Berry v. Aetna Casualty & Surety Company, supra. We cannot determine that the crane was not reasonably safe. Chaney v. Brupbacher, supra.
Similarly, we do not find any negligence in the failure to adopt a particular set of hand signals. The evidence shows that the crane operator and plaintiff had worked together frequently. The operator, considered by all parties to be well qualified and of long experience, testified that he used the standard signals and there was never any difficulty in understanding each other. The safety director testified that he posted these signals on the premises from time to time. It is important to note that there was no misunderstanding of signals which placed plaintiff beneath the boom while it was being lowered. The crane operator clearly testified that he gave no signal that he was lowering the boom. He last saw the plaintiff standing at the rear of the truck and could offer no explanation of why plaintiff was beneath the boom when he was securing it for the night.
Plaintiff would have us impose strict liability upon these defendants for violation of the statutory duties provided in LSA-R.S. 40:1672 and 1682, quoted supra. However, the latest of the cases to which he refers us, Berry v. Aetna Casualty & Surety Company, supra, in discussing section 1672, states that there is no indication in the statute itself that its object is to impose absolute liability.
We do not consider those statutes to be applicable here. While the corporate employer in some of its operations engaged in the listed uses in the statutes, the evidence does not show that the crane was being used here within the coverage of the statutes. The crane was not being used for construction, erection, etc., of a building or structure; but was being used to load and unload materials brought into the Race Street Yard.
P'or the foregoing reasons we conclude that there was no negligence or breach of the duty owed by these defendants toward plaintiff; and we must reverse the jury verdict and resulting judgment. We do not believe this to be a case of manifest error as to the facts and for this reason we have not considered the issue of contributory negligence of the plaintiff. Rather, we consider that the error committed by the jury was in the application of the law to those facts and that the result was to impose upon the defendant officers and supervisors a greater duty of care than the law requires of them. Therefore, we decree that the judgment be reversed and there is now judgment in favor of the defendant-appellants and against plaintiff-ap-pellee dismissing his suit at his costs.
Reversed.