Donald Bryan **STRICKLAND, Jr.,** a minor through Mrs. Joyce Ann Lockridge Strickland, Guardian ad Litem, et al., **Plaintiffs-Appellees,**

v.

**TRANSAMERICA INSURANCE COMPANY** et al., Defendants-**Appellants.**

No. 72–2612.

United States Court of Appeals, Fifth Circuit.

July 3, 1973.

Rehearing and Rehearing En Banc Denied Aug. 9, 1973.

---

Boris F. Navratil, Baton Rouge, La., for Transamerica Ins. Co. and others.

David W. Robinson, Baton Rouge, La., for Carner and others.

John L. Avant, Baton Rouge, La., for Strickland.

Paul H. Due, Baton Rouge, La., for Sibley and Brabham.

Walter G. Monsour, Baton Rouge, La., for Hall.

Robert J. Vandaworker, Baton Rouge, La., for Liberty Mutual Ins. Co.

Before TUTTLE, THORNBERRY and DYER, Circuit Judges.

TUTTLE, Circuit Judge.

This appeal involves five consolidated lawsuits resulting from the collapse of a crane used in the erection of a large office building by Henry C. Beck Company, a building contractor. Four of the cases were brought by employees or survivors of employees of Henry C. Beck Company, the fifth being a claim by an employee of a subcontractor. The principle issue is whether these five plaintiffs are entitled to recover damages from the building superintendent employed by the Henry C. Beck Company on the building project.

The accident, which forms the subject matter of this lawsuit, occurred on October 6, 1967, during the construction of a twenty-four story office building in Baton Rouge, Louisiana. The contractor, Henry C. Beck Company, was at that time utilizing on the building site, a large tower crane capable of being elevated as construction of the building progressed. On the day of the accident the crane was being raised from the 20th to the 21st floor when it fell suddenly, killing two and injuring three workers. Killed were Donald Strickland and Ronnie Brabham, both employees of the Henry C. Beck Company. Ferd Sibley and J. Y. Hall, Beck employees, and John G. McKellar, an employee of an electrical subcontractor, were seriously injured.

The survivors of the two decedents and the three injured workers filed

these actions in the United States District Court for the Middle District of Louisiana against several defendants, all but three of which were dismissed from the suit.[1] The three defendants remaining were William Edward Carner, who was employed by the Henry C. Beck Company as the building superintendent on the project, Transamerica Insurance Company, the alleged liability insurer of William Carner,[2] and 451 Florida Corporation, owner of the building.

Following a trial limited to the issue of liability, by its answers to special interrogatories, the jury found that Carner had been guilty of negligence and further that he was an executive officer of Henry C. Beck Company and therefore an insured under Transamerica's liability policy issued in behalf of the company.[3] Thereafter, a trial was held on the issue of damages resulting in judgments in favor of the various plaintiffs against William Carner and Transamerica in amounts totaling $715,000. Carner and Transamerica now appeal, both contending that as a matter of law Carner, as an officer of the corporation, could not be held personally liable in tort to the various plaintiffs. Transamerica contends separately (and adversely to Carner) that Carner is not, for a variety of reasons, within the coverage of the liability policy issued to the Beck Company. We affirm the judgments of the trial court.

The evidence in the case shows that the crane involved in the accident was a large construction crane variously referred to as a climbing crane, tower crane, or hammer crane. During the course of the construction the tower of the crane would project through several floors of the building with a hole left in each floor just large enough to accommodate it. Prior to the accident the crane was resting on the 17th floor with the tower projecting up through the 18th, 19th and 20th floors. After the concrete on the 20th floor had been fully poured, it became necessary to "jump" the crane to its next higher position, where its base would rest on the 18th floor. In order to make the jump a special climbing ladder was attached to the 20th floor which, upon engagement of the climbing mechanism, would bear the entire weight of the crane during the jumping operation. Just prior to the accident the jumping crew had successfully maneuvered the crane through one climbing cycle. However, in attempting to engage the next higher gusset of the climbing ladder, there was a sudden loud crack and the entire crane dropped straight downward, being stopped in its downward progress only when the top cross-boom hit the 20th floor. The boom struck Strickland, Brabham, and Sibley, killing Strickland and Brabham and injuring Sibley. Hall and McKellar, who were at the base of the tower, were injured.

At trial plaintiffs proceeded on two separate theories in support of their claims that Carner should be held personally liable to them for their injuries. First they contended that Carner was negligent in making the decision to elevate the crane just one day after the concrete on the 20th floor had been poured, thus exposing this "green" concrete to excessive stress, and second, in permitting the crane to be elevated by workers who were unfamiliar with it and whom he failed to instruct or train in the proper procedures for raising the crane.

There is no dispute in this case that it was Carner who made the decision to

---

1. The Henry C. Beck Company, being liable to each of the plaintiffs for workmen's compensation benefits, was not named as a defendant in any of these suits since the exclusive remedy against it was for workmen's compensation.

2. Transamerica was the liability insurer of the Henry C. Beck Company under a standard general liability policy which extended coverage to "any executive officer, director or stockholder" of the company acting within the scope of his duties.

3. The 451 Florida Corporation was absolved of liability by the jury and is not involved in this appeal.

jump the crane one day after the concrete had been poured.[4] This appears to have been the usual procedure. However, plaintiffs' expert witness, a Mr. Morcom, testified that in his opinion the concrete on the 20th floor would have been over-stressed by the load applied to it in the process of elevating the crane and that good engineering practices had not been followed in allowing the green concrete to be subjected to such a stress. As he said:

". . . [T]his is a very large load and you are concentrating it at one point. It's just too large a load to put on green concrete is what it amounts to."

Although defendants' expert witness, a Dr. Carver, was of the view that the particular concrete would have obtained in one day compressive strength more than adequate to support the weight of the crane there was, we think, sufficient evidence, provided by Mr. Morcom, from which the jury could have concluded that concrete failure was the cause of the accident. Moreover, Mr. Morcom had noted that while the concrete might have obtained sufficient compressive strength to support the crane, the concrete nonetheless would not be good enough in its other characteristics to carry down into the shoring system and not be over-stressed when the crane was jumped.

Plaintiffs further established, through the testimony of Ferd Sibley, that during a prior jump the supporting concrete had developed cracks around the area of the crane shaft and that Carner had been made aware of that fact but nonetheless ordered the jump to be com-

pleted. Finally, plaintiffs showed that Carner was familiar with certain specifications in the building contract which required that during a three to seven day curing period (depending on the type of concrete used):

"The concrete shall be protected from damaging mechanical disturbance particularly load stresses, heavy shocks, and excessive vibration. All finished concrete surfaces shall be protected from damage caused by construction equipment, materials, or by rain or running water. *Self-supporting structures shall not be loaded in such a way as to over-stress the concrete.*" (emphasis added).

With respect to their second theory plaintiffs introduced the testimony of a Mr. Steele, who qualified as an expert witness with respect to the crane in question and who stated that the procedure for jumping the crane followed at this particular job site was incorrect and unsafe. It was further established that Carner was familiar with the method which the jump crew used in elevating the crane and although he himself had been fully instructed in the proper procedures for doing so, he failed so to instruct the crew.

It is appellants' contention that even if the foregoing facts affirmatively establish a breach of a legal duty on Carner's part, it was the breach of a duty owed exclusively to the Henry C. Beck Company and not personally to the individual plaintiffs, and that as a consequence Carner cannot, as a matter of Louisiana law, be held liable to the plaintiffs.[5] This contention is based on

---

4. Carner was not, however, present at the site when the accident occurred.

5. In Louisiana recovery of workmen's compensation benefits from the employer is not the exclusive remedy for an injured employee. Section 23:1101 of the Louisiana Revised Statutes provides an additional cause of action by such an employee against "third persons" other than the employer, including directors, executives, officers, or agents of the employer. See e. g. Adams v. Fidelity and Casualty

Company of New York, 107 So.2d 496 (La.App.4th Cir. 1958); Lee v. Griffith, 140 So. 142 (La.App.2nd Cir. 1932). The statute provides:
"When an injury for which compensation is payable under this Chapter has been sustained under circumstances creating in some person (in this Section referred to as third person) other than the employer a legal liability to pay damages in respect thereto, the injured employee or his dependent may claim

the well-settled principle of Louisiana jurisprudence that:

> "the breach of a legal obligation by a corporate officer due and owing only to the corporation, whether it be misfeasance, malfeasance or nonfeasance, is no concern of a third party and does not give rise to any cause of action by the latter, against corporate officers." Adams v. Fidelity and Casualty Company of New York, *supra*, at 501.

However, it is equally well-settled, as the court in the Adams case said,

> "[A]n injury suffered by a third party which is due to the breach of a legal obligation which the corporate officer or officers owed to the third party, whether it also involved the breach of a duty due to the corporation, would give rise to a cause of action against the corporate officers for the breach of such legal obligation. It would matter not whether the breach of a legal obligation due and owing by a corporate officer to a third party . . . was the result of misfeasance, malfeasance, or nonfeasance." *Id.*

The difficulty, of course, in cases such as this one lies in ascertaining under what circumstances a particular duty will be deemed to be owed exclusively to the corporation, thus absolving a corporate officer of personal liability to an injured employee. The dividing line, at best, is a thin one. However, having carefully examined the case law of Louisiana we conclude that plaintiffs stated a good cause of action against Carner personally and that substantial evidence supported the jury's verdict which should, therefore, not be overturned.

The *Adams* case involved a suit for damages filed by the surviving widow of a worker who had been killed when an iron reel, weighing over 500 pounds, fell upon him from a stack of steel on his employer's premises. The court held that as to certain of the defendant corporate officers the petition stated a good cause of action inasmuch as it charged them with having seen the reel upon the stack of steel in a dangerous and perilous position "and having allowed it to remain or having failed to have it removed, although each had the authority and the duty to do so." 107 So.2d at 508. The court went on to say,

> "[T]he petition charges the three named defendants with having failed to perform a duty which each owed to the decedent and every other employee or person who might pass near this stack of steel or be upon the stack of steel in the performance of his duty as was the decedent for there was a duty on the part of each of these officials to use care and see that due care was used so as not to injure any third person and if they saw the reel on top of the stack of steel in a perilous and dangerous postion, . . . then their failure to act by allowing the reel to remain or to have it removed constituted a breach of that duty, whether the breach be considered one of omission or commission. The petition shows by its allegations that *by virtue of their position they had the authority to have had the reel which they saw in a perilous and dangerous position removed from the stack of steel." Id.* (Emphasis added.)

The door to liability for "sins of omission" by corporate officers thus having been opened many of the more recent cases have involved allegations of failure to perform certain duties, quite frequently with respect to providing a safe place in which to work. In accordance with the policy considerations of workmen's compensation laws the Louisiana courts have sought to weed out the type

---

compensation under this Chapter and the payment or award of compensation hereunder shall not affect the claim or right of action of the injured employee or his dependent against such third person, nor be regarded as establishing a measure of damages for the injury; and such injured employee or his dependent may obtain damages from or proceed at law against such third person to recover damages for the injury."

of claim in this area which ought not, as a policy matter, give rise to personal liability on the part of corporate officers. Despite apparently conflicting lines of jurisprudence in the more recent decisions there is a common thread which we perceive as running through all of them; that is, that a cause of action against officers or agents of the corporate employer is properly stated where such officer-agent knew or should have known of a specific hazard, had the authority to correct or prevent it, and either failed to do so or in some other way actively participated in allowing the harm to occur. Thus in Maxey v. Aetna Casualty and Surety Company, 255 So.2d 120 (La.App. 3rd Cir. 1971), writs refused, 260 La. 123, 255 So.2d 351, the plaintiff, who was injured in a sawmill accident, alleged in sum that the executive officers were negligent in failing to furnish him a safe place to work and to install certain safety devices. Although his petition was later amended to allege that the defendant officers knew or should have known of the safety defects in the sawmill equipment involved, the court was of the view that the failures thus alleged—which related primarily to providing a safe place for the plaintiff to work—would constitute a breach of duty which the officers owed only to the corporation. It concluded, therefore, that no cause of action had been stated. *See also*, Dulaney v. Fruge, 257 So.2d 827 (La.App. 3rd Cir. 1972), writs refused, 261 La. 482, 259 So.2d 921.

Similarly in Fontenot v. Insurance Company of North America, 271 So.2d 323 (La.App. 3rd Cir. 1972), writs granted La., 273 So.2d 295, plaintiff had alleged that the duty of providing supervision, safety rules, and instructions concerning the work involved had been delegated to the defendant executive officers, that they knew or should have known what plaintiff's job entailed, and that they failed to instruct plaintiff as to the safe practices and procedures for undertaking his work. The court, in denying the existence of a cause of action, noted:

However, plaintiff has not alleged knowledge of a *specific hazard*. She alleges only that the defendants 'knew and were well acquainted with the job routinely performed by Victor L. Fontenot and the usual operating procedures of the sodium nitrate tank and were familiar, or should have been familiar, with the operations being conducted by Victor L. Fontenot and his co-employees at the time of the accident.' Plaintiff has thus alleged no more knowledge on the part of the defendants than any supervisor would have of the functions performed by those under his authority. *His lack of allegations that the routine itself was dangerous enough to put the defendants on notice of any hazards which threatened Fontenot and his failure to allege specific hazard or danger of which the defendant knew or should have known, points out this failure to attribute fault to defendants.* 271 So.2d at 329. (Emphasis added).

In LeJeune v. Liberty Mutual Insurance Company, 261 So.2d 280 (La.App. 3rd Cir. 1972), the evidence showed that the accident in question has been caused by the improper tightening of certain guy wires thus causing the derrick to fall. However, none of the defendants had been present at the time the wires were tightened or when the accident occurred and the court, in concluding that it was error for the jury to find the defendants negligent pointed out that there was no evidence "showing that any of the defendants in this suit ordered that the wires be tightened or that they had any knowledge of the fact that they had been tightened." 261 So.2d at 284. To the same effect is Dever v. Employer's Liability Assurance Corporation Ltd., 266 So.2d 455 (La.App. 4th Cir. 1972), writs denied, 263 La. 312, 268 So.2d 256, in which plaintiff argued that the officials and supervisory employees of the company owed him the duty to keep the crane in safe working condition and that their failure to implement a maintenance program, and adequately to

supervise the operation of the crane, constituted negligence thus making the individual officers and supervisors personally liable in tort. The court refused to hold the defendant officers personally liable, noting that:

"none of these persons were [sic] present at the time of the occurrence *nor did they give any orders or do any act directly connected with the crane operation that took place and led to the accident,*"

and that even if

"the jury concluded that machinery failure was the cause, we cannot conclude *that the defendants had reasonable grounds to know that the air system would fail.*" 266 So.2d at 460. (Emphasis added.)

The result in the foregoing cases is fully consistent, we think, with the earlier case of Chaney v. Brupbacher, 242 So.2d 627 (La.App. 4th Cir. 1970), in which a vice-president and superintendent of the corporation which employed plaintiff's decedent was held liable in a wrongful death action. The court said,

"[W]e are of the opinion that Scott J. Owens, vice-president and superintendent of Aldach, was personally negligent in ordering the crane moved to or in allowing it to remain in a dangerous proximity to the wires, without removing the boom center portions to reduce its height below the wires without having the wires de-energized or insulated, when his purpose was to have workmen using the crane to move steel beams from the driveway to a location under the wires.

\*　\*　\*　\*　\*　\*

"Having set the stage for a slip of the crane boom to kill Chaney, Owens' negligence was a proximate cause of Chaney's death." 242 So.2d at 631, 632.[6]

The foregoing cases, while hardly exhaustive of the Louisiana jurisprudence on this issue, fairly outline, we think, the basis for personal liability of a corporate officer. In this case the trial court instructed the jury in part as follows:

"　.　.　.　[Y]ou cannot under Louisiana law have liability to the plaintiff unless the plaintiffs have shown by a preponderance of the evidence that he had personal knowledge of some dangerous condition or activity or that he should have had personal knowledge of such dangerous condition or activity which ultimately resulted in the accident, and that he had authority to correct that condition but failed to do so."

We are of the view that this instruction, in light of the *Adams* case and its progeny, contained a correct statement of the applicable law.

Turning to the facts of this case it is noted that Carner himself ordered the crane to be jumped on the day of the accident. Although it may have been the usual procedure on this particular building site to raise the crane a single day after the concrete on the topmost floor had been poured, the regularity of the procedure, undertaken in the past without incident, would not necessarily absolve Carner of personal liability. See Canter v. Koehring Company, *supra.* Carner knew that on a prior jump the concrete around the crane shaft had de-

---

6. The same result was reached in Canter v. Koehring Company, 267 So.2d 270 (La.App.3rd Cir. 1972), writs granted, 263 La. 233, 267 So.2d 726, in which the Louisiana court said:

"The trial judge was clearly correct in finding Frenzel negligent. He knew the shipping weight of the vessel, had supervised the addition thereto of the appurtenances and knew that this was added weight. Frenzel had supervisory control and had the duty to advise the rigger of the weight to be lifted. If he did not know the weight, he should have requested this information from Pittsburg's engineers or some other reliable source. Why didn't he do this? Maybe it was because he had never done so before. . .· . In any event, Frenzel failed in his duties." 267 So.2d at 275.

veloped cracks and was further aware that the building contract specified a three to seven day curing period prior to stressing freshly-poured concreté. Under these circumstances the jury could well have concluded that Carner knew or should have known that there might be a concrete failure in raising the crane on "green" concrete.

■ While there appears to us to be ample evidence to support a finding that concrete failure was the cause of the accident, plaintiffs at trial urged alternatively, and most vigorously, that the accident may have been caused by the jump crew's utilization of improper and unsafe methods for raising the crane.[7] Here again, even if this were concluded by the jury to be the cause of the accident, we think there was a sufficient personal nexus between Carner and its occurrence to establish an adequate foundation for a finding of personal liability. Carner ordinarily supervised the raising of the crane and the testimony showed that he was aware of the proper procedures for doing so. In suffering improper procedures to be followed by the jump crew, despite his own personal and *superior* knowledge of proper procedures, Carner could well have anticipated that an accident in jumping the crane might ultimately occur. Therefore, Carner's failure to take affirmative action to prevent it, that is, his failure to correct the crew's jumping the crane in a manner which Carner knew or should have known might result in an accident, was sufficient for the jury, we think, under the rule announced in the *Adams* case—and the "specific hazard" rule announced in the *Fontenot* case[8]—to find constituted a breach of a duty which Carner owed personally to these individual plaintiffs. We, thus, conclude that the jury's verdict of personal negligence on the part of Carner was not, as a matter of Louisiana law, unsustainable. We do not know which theory the jury accepted as having caused the accident but we conclude that the evidence would have supported a verdict on either. We, therefore, affirm the verdict in that respect.

It is next argued that the trial court stacked the deck against defendants in its instructions and interrogatories to the jury. We note that the special interrogatories were submitted to the jury in the following order:

> "(1) At the time of the accident, was Mr. William E. Carner an executive officer of the Henry C. Beck Company? . . .
>
> (2) Was Mr. William E. Carner guilty of negligence?"

It is further noted that the Court instructed the jury as follows:

> "After considering all of these criteria [relative to executive officer status], you must decide whether Mr. Carner was or was not an executive officer of the Beck Company. *After you make that decision,* you must decide whether or not Mr. Carner was personally guilty of negligence which was the proximate cause of this accident." (Emphasis added.)

Appellants urge that this charge, together with the inverse ordering of the interrogatories, invited the jury to determine *first* that Carner was covered by

---

7. Indeed this theory was the only theory specifically pleaded by each of the plaintiffs in their complaints. However, we note that Rule 15(b) of the Federal Rules of Civil Procedure provides:
   "When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues."
   Under this rule it plainly appears that the theory of concrete failure was made a *bona fide* issue in the case and could have been considered by the jury in reaching its verdict.

8. Fontenot v. Insurance Company of North America, *supra.*

the terms of Transamerica's liability policy issued to the Beck Company and then to decide whether or not he was negligent. Under these circumstances, it is argued, the jury would be more likely to find Carner personally negligent if it had first found that he was covered by liability insurance.

■ We would emphasize that it is particularly important in these Louisiana cases, wherein there is a right of direct action by an injured party against insurance companies, to protect insurance defendants from any prejudice arising from the knowledge imparted to the jury that if there is a recovery it will be the insurance company that will pay. However, it should be pointed out that appellants did not object either to the order of the interrogatories as given or to the specific instructions given by the trial court as quoted above. At the conclusion of the court's instructions counsel for appellants in behalf of Transamerica objected only to the fact that the issue of Transamerica's liability under the policy had been submitted to the jury at all, that is, Transamerica contended that the issue of its liability should have been tried separately from the issue of Carner's liability.[9] Since appellants thus failed to object specifically to those portions of the charge and the interrogatories which they now claim to have prejudiced their defense, error cannot be assigned on these grounds. See Fed.R.Civ.P. 51.

■ As to the question whether Transamerica's liability under the policy should have been tried separately from the issue of Carner's liability for personal negligence, we are, of course, in this diversity litigation bound by Louisiana law. In Louisiana, unlike most other states, a liability insurer may be sued directly by the injured party. While this rule of law might be perceived by some as creating injustice in certain cases [10] the Louisiana Revised Statutes, Section 22:655 specifically provides:

> "The injured person . . . shall have a right of direct action against the insurer within the terms and limits of the policy . . . and said action may be brought against the insurer alone or against both the insured and insurer jointly and *in solido* . . ."

In this case the trial court strictly adhered to the Louisiana rule that neither the face amount of the policy nor a copy thereof should be permitted to go to the jury. Since the issue of liability on the part of the insurance company and on

---

9. At trial counsel for appellants stated:
"With respect to Transamerica Insurance Company, I want to again re-urge my motion that the issue be taken from the jury. That motion is based upon the proposition that the question of whether Mr. Carner was an insured had nothing to do with the determination of whether or not he was negligent. The questions in this case were split—the issues were split to be tried, the issue of liability first and then the question of quantum. Whether Mr. Carner was guilty of the kind of negligence that should make him liable to these plaintiffs is solely the issue that should be before this jury; and the question of whether or not he might also be an insured is totally irrelevant to that issue. For that reason the issue should have been taken from the jury."

10. In Elbert v. Lumberman Mutual Casualty Company, 202 F.2d 744 (5th Cir.

1953) Judge Rives in a dissenting opinion said:
"Suits by the injured party directly against the insurer may operate justly under the Civil Law of Louisiana where jury verdicts are not important, . . . but where there is a common law right of trial by jury, as in the federal courts, it has been repeatedly recognized that juries are more prone to find liability and to assess heavy damages against a liability insurance company than against the insured. The mere mention of insurance to a jury is reversible error in all but four states of the union. [Citation omitted]. With both the insured and the insurer present, the federal courts could, in furtherance of justice and to avoid prejudice, order separate trials as to the cause of action against the insured and as to the existence and coverage of the policy."

the part of Carner involved many of the same witnesses and since the damage issue was severed from the liability issue by the trial court, we do not think there was an abuse of discretion in the trial court's refusal to sever the case against Transamerica from that against Carner. Indeed the prejudice to Transamerica, if any, was certainly no greater than if Transamerica had been sued alone, as permitted by the statute, rather than jointly with Carner. And our conclusion is buttressed by the fact that Transamerica raised no objection to its liability being determined along with that of Carner until plaintiffs had rested their case.

■ Transamerica next contends, adversely to Carner, that Carner as a matter of law was not covered by the general liability policy issued to the Henry C. Beck Company. It urges first that Carner simply was not an executive officer of the company and thus could not have been within the coverage of the policy which extended only to directors, stockholders, and executive officers. In support of this contention Transamerica argues that in this diversity litigation we should not apply Louisiana law but rather the law of Texas which is the *lex loci contractus*. We, however, are inclined to agree with the appellees on this issue that the law of Louisiana is controlling.[11] Under Louisiana law we think there is ample authority to support the jury's conclusion, whether the issue be treated as one of fact or of law, that Carner was an "executive officer" as that term is generally understood. Berry v. Aetna Casualty & Surety Company, 240 So.2d 243 (La.App. 2nd Cir. 1970), writs refused, 256 La. 914, 240 So.2d 374 (1970), U.S. cert. denied, 401 U.S. 1005, 91 S.Ct. 1255, 28 L.Ed.2d.541.

Transamerica further urges that Carner is not afforded coverage under the policy because of one of two exclusions contained therein. These exclusions provide that insurance coverage does not apply:

"(g) To any obligation for which the insured or any carrier as its insurer may be held liable under any workmen's compensation, unemployment compensation, or disability benefits law, or under any similar law; . . .

(h) To bodily injury to any employee of the insured arising out of and in the course of his employment by the insured; but this exclusion does not apply to liability assumed by the insured under any incidental contract;"

■ It is Transamerica's position that the first of these exclusions applies to claims of those who are injured in a manner such that the Henry C. Beck Company would be liable to them for workmen's compensation benefits and that the second of the exclusions removes from coverage bodily injury claims of employees of the Beck Company. In sum, the company contends that the words "insured," as used in these exclusions refers to the insured, that is, the Henry C. Beck Company, and that since four of the five suits in this case were based on claims for bodily injuries sustained by Beck employees and since the fifth suit involved injuries sustained by an employee of a subcontractor whose claims for such injuries were covered under the Louisiana Workmen's Compensation law, both exclusions become operative in this case and as a consequence there is no coverage under the policy for Carner. This construction of the insurance policy's exclusions runs di-

11. This is so, we think, for two reasons: First, the Louisiana courts adhere to the principle of *lex loci delicti* in tort actions, see Johnson v. St. Paul Mercury Insurance Company, 256 La. 289, 236 So. 2d 216 (1970) ; second, there being no Texas case cited to us which is dispositive of this "executive officer" issue, under the Louisiana conflicts of law rules the law of a foreign state, in the absence of proof to the contrary, is presumed to be the same as the law of the forum state. See, Succession of Gibson, 186 La. 723, 173 So. 185 (1937).

rectly counter to the Louisiana Supreme Court's construction of a similar policy in Pullen v. Employers' Liability Assurance Corporation, 230 La. 867, 89 So.2d 373 (1956). However, Transamerica urges that we adopt, notwithstanding the Erie doctrine, a different construction (and the one which Transamerica champions), which this court in Hughes v. Chitty, 415 F.2d 1150 (5th Cir. 1969), applied to like exclusions in an admiralty case. Inasmuch as *Chitty* did not involve diversity litigation, we apparently did not in that case follow, nor did we allude to, Louisiana law. In this case, of course, we are bound to do so. Therefore, in view of the rule announced in the *Pullen* case we are of the opinion that the exclusions upon which Transamerica here relies do not exclude coverage under these circumstances for Carner or others similarly situated.[12]

We are of the view that there was no error in the proceedings of the trial court. The judgment is, therefore, affirmed.

---

12. We note that Transamerica could have eliminated any ambiguity in exclusion (g) and (h) merely by qualifying the term "the insured" with the descriptive term "named" preceding the word insured. In fact the policy reflects that Transamerica did so specifically describe the insured as "the named insured" in many of the other exclusions contained in its policy.

Moreover, Transamerica did not raise any issue specifically with respect to these exclusions until after the jury had returned its verdict. Under Rule 8(c), Federal Rules of Civil Procedure, these exclusions should have been specially pleaded as an affirmative defense.