517 F.2d 254
 Maria VEGA, Individually and on behalf of Barbarita M. Vega,
a minor, Plaintiff-Appellee,
v.
SOUTHERN SCRAP MATERIAL COMPANY, INC., et al., Defendants,
Stanley M. Diefenthal and Continental Insurance Company,
Defendants-Appellants.
 No. 74-2996.
 United States Court of Appeals,
Fifth Circuit.
 Aug. 8, 1975.
 
 John J. Cooper, New Orleans, La., for defendants-appellants.
 Neville G. Orrett, New Orleans, La., Philip E. Henderson, Houma, La., for plaintiff-appellee.
 Appeal from the United States District Court for the Eastern District of Louisiana.
 Before TUTTLE, GODBOLD and MORGAN, Circuit Judges.
 GODBOLD, Circuit Judge:
 
 
 1
 This is a diversity suit by the survivors of a deceased employee, killed in a workplace accident in Louisiana, against an executive officer of the employer and against the employer's liability insurer. The jury verdict was for plaintiffs, and defendants appeal. We affirm.
 
 
 2
 The employee was covered by Louisiana's Workmen's Compensation Act, La.R.S. 23:1021 et seq., which provides that the remedies thereunder are to be the workman's exclusive remedy against his employer, La.R.S. § 23:1032. However, the Act permits any cause of action the workman may have against any third party responsible in whole or part for the injury. La.R.S. § 23:1101. Under Louisiana practice fellow employees of a corporate employer are third parties subject to suit under this provision. Usually, as a practical matter, an injured workman sues only where the fellow employee alleged to be liable is arguably covered by the employer's liability insurance policy, see Galloway v. Employer's Mutual of Wausau, 286 So.2d 676, 679 (La.App., 1973), and the policy usually restricts coverage of employees to "executive officers." This pattern has produced a jurisprudence of "executive officer suits," direct actions by injured employees against their employers' liability insurers in which the liability of the insurer turns on a question of private contract law rather than of state public policy. This suit is of that type.
 
 
 3
 Plaintiffs sued Diefenthal, president of the employer Southern Scrap Material Co., Ltd., and Southern Scrap's liability insurer, Continental Insurance Co. Liability of Continental is asserted on the alternative bases of the negligence of Diefenthal, concededly an executive officer, and of Smith, yard superintendent of Southern Scrap, whose alleged status as an executive officer is disputed. Smith was not sued personally, which is permissible under Louisiana's direct action statute.
 
 
 4
 The jury found by answers to special interrogatories that both Smith and Diefenthal were negligent and that Smith was an executive officer under Continental's insurance policy. The jury's finding that Smith was an executive officer under Louisiana jurisprudence and that he was negligent is adequately supported by the evidence, and so we affirm the verdict as to Continental's liability.[1]
 
 I. The facts
 
 5
 Southern Scrap operates a 35-acre scrap metal facility on the Industrial Canal in New Orleans, where it receives scrap by both rail and water. The scrap is processed in either the iron yard or shipwrecking department. These two units account for 90 percent of Southern Scrap's production, virtually all its business save that of a small non-ferrous section.
 
 
 6
 Running through the yard are a dozen railroad tracks, which are used both for newly-arrived purchases and for transporting scrap around the premises via open-topped railroad cars (gondolas). Newly-arrived metal from either source is placed by large cranes in piles around these various tracks. Four 15-man crews of "burners," i. e., men operating cutting torches, cut the scrap into smaller pieces that can be put through a shredder located near the center of the yard.
 
 
 7
 As these pieces of scrap are cut they are thrown into "skip buckets" in various locations in the yard. These skip buckets are quarter sections of old railroad tank cars, rather like large u-shaped troughs open at one end, and are affixed with chains so that when filled they may be lifted by the cranes to load the scrap into gondola cars either for transportation to the shredder or direct shipment to a customer. At the end of the work week and before the beginning of work the following Monday morning empty skip buckets are put in place by means of the cranes.
 
 
 8
 The decedent was a "burner." The crews of burners worked off groupings of valves called manifolds which contained the fuel supply for their torches. Each manifold had a permanent location shielded by steel drums. Hoses ran off the manifolds to the crews' particular locations.
 
 
 9
 Each crew of burners worked under a "leader man," or foreman, who in turn worked under supervisors. Other workers included the track crew and crane and locomotive operators. All of these men, in both the iron yard and shipyard, which also had its own assistant superintendent, reported ultimately to Smith, the yard superintendent. There was also a salvage department which produced the non-ferrous metals. Roughly coequal but non-producing departments included the shredder, maintenance, trucking and security departments.
 
 
 10
 Smith reported directly to Diefenthal, the president of the company, and occasionally to Adams, the vice president, who acted in Diefenthal's absence. Both Diefenthal and Adams were primarily concerned with purchases of material and sales of scrap, and thus they determined the amounts and types of material to be shipped out of their yard. Within the yard Smith had exclusive responsibility. He was delegated sole responsibility for yard operations, and that responsibility was not in turn delegated specifically to anyone else.
 
 
 11
 Among Smith's responsibilities was spotting gondola cars. Some of these would become "bellied out" from the heavy weight of scrap metal they carried. Bellied out cars were taken to a crane which, with a heavy steel weight, knocked the sides back into shape.
 
 
 12
 Decedent was killed when a gondola passed a skip bucket, struck it and knocked it over, crushing decedent and pinning another worker. The victims were working at a manifold.
 
 
 13
 On the Monday before the accident occurred a locomotive operator told the superintendent in charge of locomotives, cranes, and gondolas that the skip bucket which subsequently fell on decedent was too close to the tracks. The latter promised to have it moved but by Tuesday decided no crane was available and told the locomotive operator to be careful. A number of cars passed the bucket again on Wednesday of the accident, as they had on the two previous days. The evidence would support a conclusion that the collision occurred when a locomotive passed the skip bucket pulling a different set of cars, one of which was bellied out. There was also evidence that just before the accident the bucket may have been struck by a crane and moved closer to the track.
 
 II. Smith's status
 
 14
 The test of who is an executive officer for purposes of an employer's liability insurance policy is a jury question, see Guillory v. Aetna Insurance Co., 415 F.2d 650, 653 (CA5, 1969). We review the jury's verdict under the standard of Boeing Co. v. Shipman, 411 F.2d 365 (CA5, 1969) (en banc).
 
 
 15
 The prevailing test under Louisiana law as to who is an executive officer is a practical rather than formal one. It does not turn on the formality of corporate bylaws and board of directors' designations, Guillory, supra, 415 F.2d at 652, rejecting Bruce v. Travelers Ins. Co., 266 F.2d 781 (CA5, 1959), and Lemmons v. Zurich Ins. Co., 403 F.2d 512 (CA5, 1968); and see Employers' Liability Assurance Co. v. Upham, 150 So.2d 595 (La.App., 1963). Had the parties to the insurance contract intended so simple a distinction they would have used it, Berry v. Aetna Cas. & Sur. Co., 240 So.2d 243, 246 (La.App., 1970).
 
 
 16
 Rather the test is, sensibly, a pragmatic one. As announced in Berry it has two elements: (1) is the purported executive officer a corporate officer or does he work directly under a corporate officer and (2) does he participate "in the formulation and execution of company policy with respect to" his area of administrative responsibility?
 
 
 17
 The employee in Berry held to be an executive officer was the manager of one of Libby-Owens-Ford's 11 plants. He worked directly under a company vice president and was responsible for the operation of his plant. He had under his direction department heads, supervisors (foremen), shift superintendents and finally hourly laborers. He had authority to fire but not, apparently, to hire. The Louisiana court held him to be an executive officer as a matter of law; it would have reversed a contrary finding whether by judge or jury. 240 So.2d at 244-245, 246.
 
 
 18
 Smith was in a comparable position with Southern Scrap, making due allowance for the respective sizes of the two employers. He worked directly under the president. He had sole responsibility for the iron yard and shipyard. He had working under him at least one assistant superintendent, supervisors, foremen and laborers. The corporate officers above Smith did not take an active part in his operation of the two yards, beyond an occasional amble through the work area, and Smith might be unsupervised for months at a stretch. He did not have authority to hire but did, apparently, to fire.
 
 
 19
 Defendants made much of the fact that Smith took no part in contracting on behalf of the company for the sale of scrap or the purchase of material to be reduced to scrap. But the jury was told that Smith was the "supreme authority in the field," that other executives did not interfere with his work, and that he was responsible for 90 percent of the company's production.
 
 
 20
 On the basis of this evidence the jury could have concluded that Smith was responsible for formulating and executing company policy in the area over which he had administrative responsibility, which was production, not sales. That combined with his close connection to the president and other corporate officers satisfies the tests in Berry.[2]
 
 III. Smith's negligence
 
 21
 We conclude that Smith had a duty to act with regard to the risk to decedent's life, and failure to act rendered him liable.
 
 
 22
 Southern Scrap had a duty as employer to provide decedent with a safe place to work, La.R.S. 23:13; Eschmann v. Moyer, 253 La. 818, 220 So.2d 86 (1969); Galloway v. Employers Mutual of Wausau, 286 So.2d 676 (La.App., 1974). This duty was delegated to Smith at least tacitly as part of the delegation of all responsibility for the yard operations, and it was not in turn delegated to any other employee, Galloway, supra, at 680-681.
 
 
 23
 This duty to provide a safe place to work that Smith owed to decedent was derived from their relationships to their mutual employer, Southern Scrap. After more than a decade of doubt and division among its appellate circuits, the Louisiana Supreme Court has authoritatively determined that such a duty can be the basis for a tort action by an injured employee. Canter v. Koehring Co., La., 283 So.2d 716 (1973), approving Adams v. Fidelity and Casualty Co. of New York, 107 So.2d 496 (La.App., 1958), and Johnson v. Schneider, 271 So.2d 579 (La.App., 1972), and rejecting Maxey v. Aetna Casualty and Surety Co., 255 So.2d 120 (La.App., 1971). The Louisiana Supreme Court thus summarized its law on this question:
 
 
 24
 (T)he duty may be imposed upon the defendant solely because of the employment or agency relationship, but its breach may nevertheless make him individually liable for harm thereby sustained by a third person (including a co-employee):
 
 
 25
 The failure to act as required by the employment duty may deprive the third person of a protection owed him by the principal or employer, and such risk of harm because of the breach may have been reasonably foreseeable. Thus, the breach of the duty imposed by the employment or agency relationship may, under general tort principles, be actionable negligence because of the creation or maintenance thereby of an undue risk of harm to others.
 
 
 26
 Canter v. Koehring Co., 283 So.2d at 722.
 
 
 27
 This duty may be breached by negligence by failure to act as well as by acting affirmatively and incorrectly. Canter, supra, 283 So.2d at 719. Moreover, where the duty is a positive one to prevent dangers and take precautions, lack of detailed knowledge of the particular risk is no defense. "The breach occurs when the defendant has failed to discharge the obligation with the degree of care required by ordinary prudence . . . including when the failure results from not acting upon actual knowledge of the risk to others as well as from a lack of ordinary care in discovering and avoiding such risk of harm which has resulted from the breach of the duty." Canter, supra, 283 So.2d at 721. (Emphasis added.)
 
 
 28
 Smith had total responsibility for yard operations. He was as a practical matter delegated all of the duties of the employer with respect to the yard. This included the duty to provide a safe place to work, which duty was not in turn delegated to any other employee. Evidence in the record would justify the jury in concluding that Smith was specifically responsible for spotting gondolas and for having "bellied out" gondolas repaired. Moreover, he was constantly passing by the manifold at which Vega was working when he was killed, so that the jury could have concluded that Smith should have noticed the skip bucket dangerously close to the track.[3]
 
 
 29
 The essence of defendants' argument on appeal is that two other non-executive employees of Southern Scrap had direct knowledge of the two risks, the bellied out gondola and the skip bucket too close to the track. The knowledge of these risks by other individuals, where they had no duty to act and were not specifically delegated responsibility therefor by the employer or the executive employee, does not negate in any way Smith's primary responsibility for both discovering them and correcting these conditions.
 
 
 30
 Appellants also challenge the amount of the verdict as excessive. This contention is wholly without merit.
 
 
 31
 Affirmed.
 
 
 
 [1]
 We assume that this will adequately dispose of this suit as a practical matter, and so we do not rule on Diefenthal's negligence
 
 
 [2]
 For an equally persuasive fact situation, see Strickland v. Transamerica Ins. Co., 481 F.2d 138, 148 (CA5, 1973)
 
 
 [3]
 Even if the jury concluded that the skip bucket was struck by a crane and moved closer to the track on Wednesday, this intervening occurrence does not insulate the defendants. The evidence is not contested that on Monday the bucket was unusually and dangerously close to the track. It was then foreseeable that it might be struck and knocked closer to the track